Filed 11/27/13 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION
[NO CHANGE IN JUDGMENT]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| WILLIAM PFEIFER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> JOHN CRANE, INC., <br><br> Defendant and Appellants. | B232315 <br> (Los Angeles County <br> Super. Ct. No. BC416536) <br><br> ORDER MODIFYING OPINION <br> AND DENYING REHEARING |

THE COURT:*

It is ordered that the opinion filed herein on October 29, 2013 be modified as follows:

On page 36, lines 15 and 16, delete "subdivision (c) of Civil Code section 3295, which limits pretrial discovery regarding a defendant's financial condition" and substitute: Code of Civil Procedure section 1989, which limits the efficacy of subpoenas to California residents

On page 38, line 23, between the ellipsis " . . . ." and "Upon," insert: However, the plaintiff may subpoena documents or witnesses to be available at the trial for the purpose of establishing the profits or financial condition [of the defendant] . . . .

On page 39, line 5, delete the phrase "motion procedure" and substitute: subpoena and motion procedures

On page 40, lines 19 and 20, delete the phrase "motion procedure" and substitute: subpoena and motion procedures

On page 40, line 20, delete "As noted in *Mike Davidov Co.*, that procedure was rendered superfluous by" and substitute:  Under *Mike Davidov Co*., the trial court was authorized to order discovery following

On page 41, line 24, following the sentence ending with the word "trial," insert the following footnote:  JCI contends that the holding in *Mike Davidov Co.* renders the subpoena procedure in section 3295 wholly inessential or superfluous. We disagree.  For the reasons explained above, in addition to establishing pretrial procedures enabling plaintiffs to ensure the presentation of the requisite evidence at trial, the statute affords the trial court discretionary authority to order discovery after the defendant's liability for an award of punitive damages has been determined at trial.

On page 42, line 10, delete the phrase "it applied to" and substitute: subdivision (c) precludes the trial court from ordering

The petition for rehearing by John Crane, Inc. is denied.  The modification does not change the judgment.

_____

*EPSTEIN, P. J.,   MANELLA, J.,            SUZUKAWA, J.

2

Filed 10/29/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ANNE PFEIFER, Individually and as Personal Representative, etc., <br><br><br> Plaintiff and Appellant, <br><br> v. <br><br> JOHN CRANE, INC., <br><br> Defendant and Appellant. | B232315 <br> (Los Angeles County <br> Super. Ct. No. BC416536) |

APPEAL from an order of the Superior Court of Los Angeles, Amy Hogue, Judge. Affirmed as modified.

Simon Greenstone Panatier Bartlett and Brian P. Barrow for Plaintiffs and Appellants William Pfeifer and Anne Pfeifer.

Farella Braun & Martel, John L. Cooper, Racheal Turner and Deborah K. Barron for Defendant and Appellant John Crane, Inc.

William and Anne Pfeifer asserted claims for negligence, strict liability, and loss of consortium against John Crane, Inc. (JCI), alleging that its asbestos-laden products caused William Pfeifer's mesothelioma. During the trial, the court rejected JCI's proffered instructions regarding its "sophisticated user" defense, and directed a verdict on the defense. After the jury returned a verdict in the Pfeifers' favor, a judgment was entered awarding them compensatory and punitive damages. The trial court subsequently entered orders, inter alia, crediting JCI with an offset for pre-verdict settlements, and awarding expert fees to the Pfeifers. JCI appealed from the judgment and certain related orders, and the Pfeifers cross-appealed.

Regarding JCI's appeal, we conclude that the trial court correctly declined to give JCI's requested instructions on its "sophisticated user" defense, which stated that employees of a sophisticated user are deemed to be sophisticated users. We hold that when a manufacturer provides hazardous goods to a "sophisticated" intermediary that passes the goods to its employees or servants for their use, the supplier is subject to liability for a failure to warn the employees or servants of the hazards, absent some basis for the manufacturer to believe the ultimate users know or should know of the hazards. With respect to JCI's other contentions, we conclude there was sufficient evidence to support the jury's findings regarding comparative fault, and that the award of punitive damages was supported by the evidence and was not excessive in amount. We dismiss JCI's appeal insofar as it challenges an award of expert fees to the Pfeifers, as JCI filed no notice of appeal from the award. Regarding the Pfeifers' cross-appeal, we affirm the trial court's determination of JCI's credit for the pre-verdict settlements.

We otherwise find no error in the judgment and related orders, with the exception of an error both sides acknowledge regarding the determination of the

2

Pfeifers' net recovery of economic damages. We therefore dismiss JCI's appeal in part, modify the judgment to reflect the correct determination of the Pfeifers' net economic damages, and affirm the judgment and related orders, as modified.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A. *Pretrial Proceedings*

Beginning in 1917, JCI manufactured and sold packing used in valves and pumps, and distributed gaskets used in flanges and pipe systems. Some of these products contained asbestos. JCI sold packing and gaskets containing asbestos to the United States Navy and to the United States government. From 1963 to 1971, William Pfeifer served in the Navy. After leaving the Navy, he worked for the United States government as a boiler technician until 1982. In 2009, he was diagnosed with pleural mesothelioma, a type of cancer usually caused by exposure to asbestos.

On June 25, 2009, the Pfeifers filed their complaint for negligence, strict liability, and loss of consortium against approximately 31 suppliers of asbestos-laden products. The complaint alleged that William Pfeifer's mesothelioma resulted from his exposure to asbestos from the defendants' products. The Pfeifers sought compensatory and punitive damages.

B. *Trial*

Prior to trial, the Pfeifers entered into settlements with several defendants. At a result of the settlements and other dispositions, on November 1, 2010, at the commencement of jury selection, JCI was the sole remaining defendant in the action. Trial was bifurcated with respect to punitive damages.

1. *First Phase of Trial*

a. *The Pfeifers' Evidence*

William Pfeifer testified that after he entered the Navy in August 1963, he served as an apprentice fireman and boiler tender aboard destroyers. His responsibilities included removing and replacing gaskets and packing containing asbestos. The air he breathed often became dusty when he scraped away old gaskets and packing and replaced them. The Navy neither supplied him with a respirator nor provided training regarding dusty environments. From 1971 to 1982, after leaving the Navy, Pfeifer worked as a boiler technician at several land-based United States government sites. During that period, he replaced gaskets and packing; in addition, he sometimes repaired boilers with an asbestos-based JCI product that he did not encounter in the Navy, namely, a rope-like gasket that released dust when he put it in place. In May or June 2009, he learned that he had mesothelioma.

According to Pfeifer, JCI was a key supplier of the gaskets and packing he encountered in the Navy and as a boiler technician. Among the JCI products he frequently used were "2150 sheet gaskets." Pfeifer estimated that JCI supplied 75 percent of the gaskets he removed, 70 percent of the materials from which he made replacement gaskets, and 90 to 95 percent of the packing he removed and replaced.

James R. Millette, an environmental scientist, testified that he examined JCI products identical or similar to those William Pfeifer encountered. According to Millette, JCI's products showed exposed asbestos fibers, even though the products embedded the fibers in graphite or other materials. In addition, Millette opined that the cutting, scraping, and other operations that Pfeifer performed on the products released asbestos fibers into the air.

4

Dr. Carl Andrew Brodkin, a specialist in asbestos-related diseases, opined that Pfeifer's exposure to asbestos substantially contributed to his mesothelioma. Brodkin further testified regarding the evolution of medical knowledge concerning asbestos-related diseases. According to Brodkin, as early as 1927, researchers knew that exposure to asbestos dust caused the noncancerous lung disease called "asbestosis." In the 1940's, 1950's, and 1960's, research studies linked asbestos to certain cancers, namely, lung cancer and mesothelioma. By 1960, it was generally accepted that exposure to asbestos caused mesothelioma. At the time, the hazards of asbestos were reported in medical journals and the popular media, including magazines such as Newsweek.

George Springs, a retired JCI vice president, testified as JCI's designated representative regarding its response to the hazards of asbestos. He stated that from 1931 to 1985, JCI sold gaskets and packing containing asbestos. During that period, JCI conducted no research into whether its asbestos-laden products were hazardous.

Springs further testified that JCI first became aware of asbestos's health hazards in 1970, when it learned that handling raw asbestos enhanced the risk of lung problems for workers who smoked. In 1975, to comply with regulations propounded by the federal Occupational Safety and Health Administration (OSHA), JCI began monitoring the air in its factories for asbestos particles, and used engineering controls to help keep dust levels down. In 1981, pursuant to the OSHA regulations, JCI created a safety data sheet regarding the 2150 gaskets, which stated that overexposure to asbestos caused asbestosis and cancer. Because JCI prepared the safety data sheet for the benefit of its employees, customers received a copy only when they asked for it. In 1983, JCI began placing warnings on its products regarding the hazards of asbestos.

5

According to Springs, the absence of warnings on JCI's products was consistent with the then-effective OSHA regulations, which required no labels when the asbestos fibers in a product were encased in bonding materials such as graphite, grease, oil, or rubber, unless it was reasonably foreseeable that their use would release concentrations of asbestos fibers exceeding certain defined limits. Springs acknowledged that JCI knew that its customers sometimes replaced gaskets using methods that created asbestos dust or fragmented old gaskets. He stated that JCI recommended other methods which, if properly applied, released little dust. Springs also acknowledged that JCI never tested its products to determine whether the bonding agents prevented the release of asbestos fibers.

David Todd Fractor, an economist, estimated that William Pfeifer's lost earnings, benefits, and household services totaled $1,508,335. The parties stipulated that William Pfeifer's past medical expenses were $1,054,469.47, and Dr. Robert Cameron, a thoracic surgeon who treated William Pfeifer, opined that asbestos exposure caused Pfeifer's mesothelioma, and that his future medical expenses ranged from $500,000 to "several" million dollars. Anne Pfeifer testified regarding the Pfeifers' non-economic injuries.

### b. *JCI's Evidence*

James Paul Delaney, who served as an apprentice fireman and machinist's mate in the Navy, testified regarding the Navy's procedures for replacing gaskets and packing. He stated that the Navy required personnel to wear respirators in dusty environments, that the Navy began an asbestos abatement program in the 1970's, and that warning labels first appeared on asbestos-laden products bought by the Navy in the 1980's. According to Delaney, the Navy's specifications for a product regulated the words placed on the product.

Dr. Allan Feingold, a lung specialist, opined that William Pfeifer's mesothelioma arose from his exposure to specific types of asbestos fibers not found in significant quantities in the relevant JCI products. According to Feingold, those types of asbestos fibers were present in thermal insulation and other items the Navy bought from other suppliers.

### c. *Verdict*

The jury returned special verdicts in favor of the Pfeifers on their claims for negligence, strict liability, and loss of consortium. The jury found that William Pfeifer had suffered $3,203,580.47 in economic damages, including $1,054,469.47 in past medical expenses, and $4,000,000 in noneconomic damages. The jury also found that Anne Pfeiffer had suffered $1,050,000 in noneconomic damages for loss of past and future consortium. The jury allocated JCI a 70 percent share of comparative fault, and found that it had acted with malice, oppression, or fraud.

### 2. *Second Phase of Trial*

Pursuant to a stipulation, the Pfeifers' counsel presented information to the jury regarding JCI's assets and liabilities for the 2009 and 2010 fiscal years derived from JCI's annual report and financial statement. The jury awarded the Pfeifers $14,500,000 in punitive damages.

### C. *Judgment and Post-Judgment Orders*

On February 3, 2011, a judgment was entered in favor of the Pfeifers awarding damages totaling $21,238,580.47. The trial court deferred determining the extent to which the Pfeifers' pre-verdict settlements required an adjustment of the jury's award of economic damages to William Pfeifer.

In early March 2011, Anne Pfeifer became the personal representative for William Pfeifer, who died on February 22, 2011.  On March 9, 2011, the trial court granted JCI's motion to reduce the award to William Pfeifer for his past medical expenses from $1,054,469.47 (the amount stipulated at trial) to $545,703.29.  The court later awarded JCI a settlement-based offset of $1,320,192 against the award of economic damages to William Pfeifer, as adjusted by its March 9 ruling, and denied JCI's motions for a new trial and judgment notwithstanding the verdict.

On April 13, 2011, JCI appealed from the judgment and certain related orders.  On April 21, 2011,the Pfeifers noticed their cross-appeal from the judgment and the related orders.  On the same date, the trial court granted in part and denied in part JCI's motion to tax costs, insofar as the Pfeifers sought an award of expert fees under Code of Civil Procedure section 998.

## DISCUSSION

### I

### JCI's Appeal

JCI contends (1) there was insufficient evidence to support the jury's findings regarding comparative fault; (2) the trial court erred in rejecting JCI's proffered instructions regarding its "sophisticated user" defense, and directing a verdict on the defense; (3) the award of punitive damages is unsupported by the evidence and is excessive in amount; and (4) the court erred in issuing an award of expert fees to the Pfeifers.  For the reasons explained below, we reject JCI's first three contentions, and conclude that we lack jurisdiction to examine the remaining contention.

A. *Comparative Fault*

JCI contends that the jury's findings regarding comparative fault fail for want of substantial evidence. The immediate targets of JCI's challenge are the findings regarding JCI, William Pfeifer, the United States Navy, and Flexitallic, which manufactured a type of gasket known as a "spiral-wound" gasket. JCI further argues that because those findings are interwoven with the jury's other findings regarding liability, a new trial is necessary.

1. *Governing Principles*

The comparative fault doctrine "is designed to permit the trier of fact to consider all relevant criteria in apportioning liability. The doctrine 'is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an "equitable apportionment or allocation of loss."' [Citation.]" (*Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1233 (*Rosh*), quoting *Knight v. Jewett* (1992) 3 Cal.4th 296, 314.) For this reason, comparative negligence "does not lend itself to 'the exact measurements of a micrometer-caliper.'" (*Rosh*, *supra*, at p. 1233, quoting *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 736.) Generally, a defendant has the burden of establishing that some nonzero percentage of fault is properly attributed the plaintiff, other defendants, or nonparties to the action. (See *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 476 (*Sparks*).)

Here, the special verdict form asked the jury to determine whether William Pfeifer was "negligent in his work with [JCI's] gaskets or packing," and if so, whether his negligence was a substantial factor in causing his harm. The special

9

verdict form also requested findings regarding the percentage of fault attributable to JCI, Pfeifer and several other parties, including the United States Navy, the manufacturers and suppliers of thermal insulation that Pfeifer encountered, and two manufacturers of asbestos-laden gaskets, namely, Garlock and Flexitallic. The jury found that although Pfeifer was negligent, his conduct was not a substantial factor in the causation of his injuries. The jury allocated fault as follows: 70 percent to JCI, 0 percent to Pfeifer, 12.5 percent to the Navy, 12.5 percent to the manufacturers and suppliers of thermal insulation, 5 percent to Garlock, and 0 percent to Flexitallic.

We review these findings for the existence of substantial evidence. (*Sparks*, *supra*, 32 Cal.App.4th at p. 476; *Rosh*, *supra*, 26 Cal.App.4th at p. 1234.) On review for substantial evidence, we "consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment. [Citation.]" (*Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 561.) Under this standard, "'the appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment. [Citation.]'" (*Rosh*, *supra*, at p. 1234, quoting *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 346.) For this reason, courts rarely disturb the jury's apportionment of fault. (*Ibid*.)

### 2. *Finding Regarding JCI*

JCI challenges the finding allocating it a 70 percent share of fault for William Pfeifer's cancer, arguing that there was undisputed evidence that Pfeifer was exposed to asbestos from numerous sources, many of which were not listed in the special verdict form. Pfeifer testified that from 1963 to 1982, he encountered

10

800 to 1000 gaskets, 70 percent of which were made by JCI, and 600 to 800 valve packings, 90 to 95 percent of which were made by JCI. However, Pfeifer also acknowledged that in 1987, he sued numerous manufacturers and suppliers of asbestos-based products other than JCI, and received compensation through settlements. In addition, the jury heard certain interrogatory responses from the Pfeifers listing the suppliers of asbestos-laden products that William Pfeifer had encountered. JCI contends this evidence required the jury to allocate a smaller share of comparative fault to it. We disagree.

Aside from the evidence regarding the potential comparative fault of the suppliers named in the special verdict, the record discloses no evidence quantifying Pfeifer's exposure to asbestos from the other sources identified in his 1987 complaint and the Pfeifers' interrogatory responses. In the absence of such evidence, the jury reasonably allocated a 70 percent share of comparative fault to JCI. (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 33 (*Stewart*) [despite plaintiff's admission that he was exposed to asbestos from many sources, jury reasonably allocated 85 share of comparative fault to asbestos product manufacturer that submitted no evidence detailing plaintiff's exposure from other sources]; *Sparks*, *supra*, 32 Cal.App.4th at pp. 477-479 [jury reasonably found that defendant's asbestos-based product was sole cause-in-fact of plaintiff's mesothelioma when defendant submitted no evidence specifying extent of plaintiff's exposure to asbestos from other manufacturers' products].)

### 3. *Findings Regarding William Pfeifer*

JCI maintains the jury was required to find that William Pfeifer's share of fault exceeded zero percent. Regarding this contention, the record establishes that Pfeifer sometimes removed JCI gaskets and packing with power wire brushes or

11

compressed air. Those practices were contrary to JCI's recommendations and the Navy's training, as they increased the risk of damage to valves and eye injuries to workers. As JCI further notes, the Pfeifers' experts testified that the use of power wire brushes released far more asbestos dust that ordinary scraping, and that mesothelioma is a "cumulative dose-response disease," that is, each exposure to asbestos increases the risk of mesothelioma.

JCI argues that this evidence compelled the jury to find that Pfeifer's share of fault for his injuries was greater than zero percent. We reject this contention. Under the principles of comparative fault, a person's negligent conduct may be assigned a share of fault greater than zero percent only when the conduct was a substantial factor in the causation of the pertinent injuries. (*Stewart, supra,* 190 Cal.App.4th at p. 33; *Chakalis v. Elevator Solutions, Inc.* (2012) 205 Cal.App.4th 1557, 1572-1573.) As explained below, the trial evidence does not compel a finding that Pfeifer's conduct was a substantial factor in the causation of his cancer.

Generally, California applies the substantial factor test to so-called "cause-in-fact" determinations. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968 (*Rutherford*).) Under this test, a force that plays only an "'infinitesimal'" or "'theoretical'" role in the causation of injury is not a substantial factor. (*Id.* at p. 969.) In the context of injury claims based on exposure to asbestos from multiple sources, plaintiffs may establish that asbestos from a specific defendant's product was a "cause in fact" of their cancer by showing that the asbestos "was a substantial factor contributing to the . . . *risk* of developing cancer." (*Id.* at pp. 969, 977.) To make this showing, plaintiffs need not demonstrate that the specific asbestos particles from the defendant's products actually caused the cancer. Rather, the showing may be based on expert testimony regarding the size

of the "dose" or the enhancement of risk attributable to exposure to asbestos from the defendant's products. (*Id*. at p. 976, fn. 11.) Nonetheless, plaintiffs must demonstrate conduct that "was a substantial factor in contributing to the aggregate dose of asbestos the plaintiff . . . inhaled or ingested, and hence to the risk of developing asbestos-related cancer." (*Id*. at pp. 976-977, italics omitted.)

Under these principles, JCI's contention fails, as the trial evidence does not compel the inference that Pfeifer's use of power wire brushes and compressed air was a substantial factor in causing his cancer. Pfeifer testified that the air became dusty when he used hand powered tools to make new gaskets and remove old gaskets and packing. According to Pfeifer, he used a power wire brush only when a gasket was difficult to remove, and "sometimes" resorted to compressed air.

Absent from the record is evidence establishing the extent to which Pfeifer's use of power wire brushes and compressed air contributed to his "aggregate dose" of asbestos particles. (*Rutherford, supra,* 16 Cal.4th at pp. 976-978.) There is no evidence regarding how often Pfeifer resorted to power wire brushes or compressed air, and no expert opined that Pfeifer's use of these tools was, by itself, a substantial factor in the causation of his cancer. The Pfeifers' experts opined only that Pfeifer's cumulative exposure to asbestos caused his cancer, and that his exposure to asbestos from JCI's products "substantial[ly] contribut[ed]" to that illness.

Because JCI bore the burden of proof at trial regarding Pfeifer's negligence and comparative fault, JCI was obliged to present evidence that the aggregate dose of asbestos particles arising from Pfeifer's use of power wire brushes and compressed air constituted a substantial factor in the causation of his cancer. This JCI did not do. Accordingly, the jury was not required to find that Pfeifer's share

of fault exceeded zero percent.  (See *Stewart, supra,* 190 Cal.App.4th at p. 33; *Sparks*, *supra*, 32 Cal.App.4th at pp. 477-479.)[1]

### 4. *Finding Regarding Flexitallic*

Pointing to William Pfeifer's testimony that Flexitallic supplied 20 percent of the gaskets he encountered, JCI contends the jury was obliged to find that Flexitallic's share of fault was greater than 0 percent.  We disagree.

The evidence at trial established that Flexitallic manufactured a type of gasket called a "spiral-wound gasket."  Unlike JCI's gaskets, which were made from flat sheets containing asbestos and used in low pressure systems, Flexitallic gaskets were designed for use in high pressure systems.  They consisted of a spiral of coiled metal containing asbestos fiber material as a filler.  Their flexible metal construction permitted them to provide a seal while absorbing the shocks to which warships were subject.

The evidence further established that of the gaskets and packing that Pfeifer encountered, Flexitallic gaskets generated the least amount of asbestos dust.  The Pfeifers' expert witnesses testified that working with a coil-wound gasket released approximately 1/10 (or less) the number of fibers produced by scraping away a

---

[1]     In a related contention, JCI suggests that the Pfeifers advocated the theory that "each exposure to asbestos dust was a substantial factor contributing to [William] Pfeifer's risk of developing [cancer]"; JCI notes that during closing arguments, the Pfeifers' counsel stated, "[O]ur experts told you about the fact that each and every exposure to asbestos caused . . . Pfeifer's [cancer]."  In our view, the Pfeifers relied on no such theory, notwithstanding the remark quoted above.  Shortly after making the remark, the Pfeifers' counsel argued that the experts said that each exposure "contributed" to Pfeifer's cancer, that no single exposure could be singled out as "a cause," and that "it is the total dose that puts the person at risk."  In addition, counsel observed that according to the experts, Pfeifer's exposure to asbestos from JCI's products "was a substantial contributing factor of his mesothelioma."

sheet gasket with a hand tool, and that other activities involving sheet gaskets produced even greater exposures to asbestos fibers.

In view of this evidence, the jury was not compelled to conclude that Flexitallic gaskets were a substantial factor in causing Pfeifer's cancer. The testimony described above supported the reasonable inference that Pfeifer's cumulative exposure to asbestos from Flexitallic gaskets was far less than his cumulative exposure to asbestos from JCI's products. Moreover, JCI offered no expert testimony that Pfeifer's aggregate dose of asbestos from Flexitallic gaskets constituted a substantial factor in causing his cancer. Accordingly, the evidence did not mandate a finding that Flexitallic's share of fault exceeded zero percent. (*Sparks*, *supra*, 32 Cal.App.4th at pp. 477-479.)

### 5. *Finding Regarding the Navy*

JCI contends the jury's allocation of a 12.5 percent share of fault to the Navy fails for want of substantial evidence, arguing that the Navy knew that JCI's products endangered Pfeifer, yet exposed him to those products while he served in the Navy from 1963 to 1971. We reject this contention.

To begin, we note that over half of William Pfeifer's exposure to asbestos from JCI's products occurred after he left the Navy. The Pfeifers predicated their claims on William Pfeifer's cumulative exposure to JCI's products from 1963 to 1982, a period that encompassed both Pfeifer's service in the Navy until 1971 and his later work as a civil boiler technician. Generally, the jury was permitted to consider the relative culpability of the parties in assessing comparative fault. (*Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 148.) Accordingly, the jury could properly adjust its determinations of comparative fault to reflect Pfeifer's period of service in the Navy.

Furthermore, the jury was permitted to increase JCI's share of liability because it determined that JCI's misconduct was more egregious than the Navy's misconduct. (*Scott v. County of Los Angeles, supra,* 27 Cal.App.4th at p. 148.) As we explain further below, the evidence supported the inference that JCI was consciously indifferent to the dangers that its products posed to consumers (see pt. C.1.a., *post*), while the Navy was merely negligent regarding those dangers during Pfeifer's period of service (see pt. B.3., *post*). The evidence was thus sufficient to support the jury's allocation of comparative fault, in view of the differences in the length and gravity of JCI's and the Navy's misconduct. (See *Daly v. General Motors Corp.*, *supra*, 20 Cal.3d at p. 742 [observing that the principles of comparative fault "elevate justice and equity above the exact contours of a mathematical equation"].)

### B. *"Sophisticated User" Defense*

JCI contends the trial court improperly rejected its proposed instructions on what JCI characterizes as its "sophisticated user" defense, and directed a verdict on the defense. According to the proffered defense, JCI was not liable for its failure to warn William Pfeifer regarding the hazards of asbestos while he served in the Navy because the Navy allegedly had greater knowledge of those hazards than JCI. As explained below, we find no error in the trial court's ruling.

### 1. *Types of "Sophisticated User" Defense*

The term "sophisticated user defense" has been applied to at least two potentially overlapping defenses traceable to section 388 of the Restatement Second of Torts (section 388), which specifies when a supplier of goods is subject to liability for providing dangerous items lacking suitable warnings to users either

"directly or through a third person."[2] (*Mack v. General Electric Co.* (E.D. Pa. 2012) 896 F.Supp.2d 333, 339-340 (*Mack*); see *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 66 (*Johnson*); *Persons v. Salomon North America, Inc.* (1990) 217 Cal.App.3d 168, 175 (*Persons*).) The first defense is reflected in comment k accompanying section 388, which states that the supplier's duty to warn arises only when the supplier "has no reason to expect that [the item's user] will . . . realize the danger involved" (Rest.2d Torts, § 388, com. k., pp. 306-307). (*Johnson*, *supra*, 43 Cal.4th at p. 66.) The second defense is reflected in comment n accompanying section 388, which states that when the supplier provides items to a third party that will pass them to the user, the supplier may in some circumstances discharge its duty to warn the user by informing the third party of the item's dangers (Rest.2d Torts, § 388, com. n., pp. 307-310). (See *Persons, supra,* 217 Cal.App.3d at p. 175.) Although section 388 addresses only suppliers of goods, sections 394 and 399 of the Restatement Second of Torts extend the application of section 388 -- and impliedly, the two defenses -- to manufacturers and sellers.

In *Johnson*, *supra*, 43 Cal.4th at page 61, our Supreme Court recognized the defense based on comment k accompanying section 388. There, a trained and

---

[2]     Section 388 states: "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier  [¶]  (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and  [¶]  (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and  [¶]  (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

certified heating, ventilation, and air conditioning (HVAC) technician suffered injuries due to his repeated exposure to R-22, a refrigerant. (*Johnson*, *supra*, at pp. 61-62.) The technician asserted claims for personal injury against several manufacturers and suppliers, alleging that they had failed to warn him of the dangers of R-22. (*Id*. at p. 62.) After one of the defendants obtained summary judgment on the ground that the technician was aware of the risks of R-22, the Supreme Court held that the sophisticated user defense, as reflected in comment k to section 338, was applicable in California. (*Johnson*, *supra*, at p. 61.)

In so concluding, the court stated: "A manufacturer is not liable to a sophisticated user of its product for failure to warn of a risk, harm, or danger, if the sophisticated user knew or should have known of that risk, harm, or danger. It would be nearly impossible for a manufacturer to predict or determine whether a given user or member of the sophisticated group actually has knowledge of the dangers because of the infinite number of user idiosyncrasies. . . . However, individuals who represent that they are trained or are members of a sophisticated group of users are saying to the world that they possess the level of knowledge and skill associated with that class. If they do not actually possess that knowledge and skill, that fact should not give rise to liability on the part of the manufacturer. [¶] Under the 'should have known' standard there will be some users who were actually unaware of the dangers. . . . [Nonetheless], even if a user was truly unaware of a product's hazards, that fact is irrelevant if the danger was objectively obvious. [Citations.] Thus, under the sophisticated user defense, the inquiry focuses on whether the plaintiff knew, or should have known, of the particular risk of harm from the product giving rise to the injury." (*Johnson, supra*, 43 Cal.4th at p. 71.)

18

In *Stewart,* the appellate court distinguished the defense recognized in *Johnson* from the defense reflected in comment n to section 388, which it called "the sophisticated intermediary doctrine." (*Stewart*, *supra*, 190 Cal.App.4th at pp. 8-30.) In that case, a plumber asserted claims against a supplier of raw asbestos, alleging that his lengthy contact with manufactured products containing the supplier's asbestos caused his mesothelioma. (*Id*. at pp. 25-27.) At trial, the court refused the supplier's request for instructions on a "sophisticated user" defense, which relied not on the theory that plumber had an opportunity to discover the hazards of using asbestos-based products, but on the theory that the manufacturers of the asbestos-based products were aware of them. (*Id*. at pp. 28-29.)

In affirming the ruling, the appellate court concluded there was no evidence to support any type of "sophisticated user" instruction. The court stated that no instruction was warranted under *Johnson,* as that decision "did not impute an intermediary's knowledge to the plaintiff, or charge him with any knowledge except that which had been made available to him through his training and which, by reason of his profession and certification, he should have had." (*Stewart*, *supra*, 190 Cal.App.4th at pp. 28-29.) The court further determined that the "sophisticated intermediary" defense reflected in comment n to section 388 was inapplicable, reasoning that the defendant had provided no warnings to the intermediary manufacturers. (*Stewart*, *supra*, at pp. 29-30.) The court also rejected any "sophisticated purchaser" defense predicated on the relationship between a "sophisticated user intermediary" and its employees, in view of the fact that the plaintiff was not an employee of the intermediary manufacturers. (*Id*. at p. 29.)

19

## 2. *Underlying Proceedings*

Prior to trial, JCI requested special instructions regarding its "sophisticated user" defense, which relied on William Pfeifer's relationship with the Navy during his naval service. The instructions stated that a defendant has no duty to warn a sophisticated user or its employees of the potential hazards of its products, and that the employees of a sophisticated user are "deemed" to be sophisticated users.[3]

Following the presentation of evidence at trial, the Pfeifers sought a directed verdict on JCI's defense. They argued that under the circumstances of the case, JCI was obliged to show not only that the Navy, as an alleged sophisticated "intermediar[y]," knew or should have known of the dangers of asbestos, but that JCI reasonably relied on the Navy to pass that information to Pfeifer. In granting the motion, the trial court appears to have concluded that JCI's proposed instructions reflected no recognized defense, and that there was insufficient evidence to support instructions on any sophisticated intermediary defense. The court stated it "[was] going to refuse to give the jury instruction with respect to [a] sophisticated intermediary [defense], which effectively . . . is a directed verdict as to that defense."

## 3. *JCI's Contention*

As explained below, we see no error in the trial court's ruling. Generally, a directed verdict is proper on a defense if there is insufficient evidence to support the defense.[4] Furthermore, although a defendant is entitled upon request to correct

---

[3]    On appeal, JCI does not contend that any employer of William Pfeifer other than the Navy was a sophisticated user.

[4]    "A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all
*(Fn. continued on next page.)*

20

instructions on any defense shown by the evidence, (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572), the court may reject an instruction that contains incorrect statements of law (*Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 782), and need not correct the instruction unless the failure to do so would deny the jury guidance on a fundamental legal principle applicable to the case (*Paverud v. Niagara Machine & Tool Works* (1987) 189 Cal.App.3d 858, 863, overruled on another ground in *Soule v. General Motors Corp.*, *supra*, 8 Cal.App.4th at p. 572). As explained below, JCI's proposed instructions were erroneous, and there was insufficient evidence to support the defense, properly stated.[5]

Our inquiry is focused on the defense recognized in *Johnson,* as it is undisputed that JCI provided no warnings to the Navy. In directing a verdict on JCI's proffered defense, the trial court declined JCI's request to instruct the jury that a defendant has no duty to warn a sophisticated user or its employees of the potential hazards of its products, and that the employees of a sophisticated user are "deemed" to be sophisticated users. On appeal, JCI does not suggest that William Pfeifer was a sophisticated user, that is, that he knew, or should have known, of the hazards of asbestos. Rather, JCI argues that "[t]he logical application of

---

the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629-630.) The trial court's ruling is reviewed de novo. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.)

[5] As JCI does not suggest that the trial court was obliged to correct its proposed instructions, JCI has forfeited any contention that the jury should have received modified instructions.

*Johnson . . .* is that a manufacturer who sells its products to a sophisticated user has no duty to attempt to warn that sophisticated user's *employees* of hazards of its products." (Italics added.)

JCI's contention presents an issue not examined in *Stewart*, namely, the extent to which a defendant may assert the sophisticated user defense identified in *Johnson* against employees or servants of a "sophisticated user intermediary" who purchased the defendant's goods (*Stewart*, *supra*,190 Cal.App.4th at p. 29). The crux of JCI's contention is that as a matter of law, the intermediary's knowledge (or potential knowledge) of the hazards associated with the goods shields the supplier from liability to the intermediary's employees or servants arising from a failure to warn.[6]

There is a division of authority regarding this question in other jurisdictions. (See *Mack, supra*, 896 F.Supp.2d at pp. 339-342 [discussing division].) Some courts have held that the existence of an employer-employee relationship between the sophisticated intermediary and the plaintiff does not, by itself, screen defendants from liability for a failure to warn. Thus, in *In re Brooklyn Navy Yard Asbestos Litigation* (2d Cir. 1992) 971 F.2d 831, 836, workers in Navy shipyards sued manufacturers and suppliers of asbestos-laden products, alleging that their exposure to the products caused cancer and other illnesses. Like JCI, the defendants maintained that the Navy's superior knowledge of the dangers of asbestos shielded them from liability for their failure to warn the workers. (*Id.* at p. 838.) Noting comment n to section 388, the Second Circuit rejected the defendants' contention: "Given that the record supports neither a finding that

---

[6]    We granted a request from the Civil Justice Association of California (CJAC) to submit a brief as an amicus curiae.

defendants actually relied on the Navy to warn its workers, nor a finding that any such reliance would have been justifiable, the presence of the Navy as an alleged 'sophisticated intermediary' or 'knowledgeable user' does not call into question the jury's finding of defendants' duty to warn." (*Ibid.*)

Other courts have determined that an employer-employee relationship may preclude the supplier's liability for a failure to warn, provided that the relationship involved employee training or experience rendering both the intermediary and the employee sophisticated users. In *Strong v. E. I. Dupont De Nemours Co., Inc.* (8th Cir. 1981) 667 F.2d 682, 683 (*Strong*), a construction supervisor for a natural gas company died when a pipe carrying natural gas exploded as he inspected it. The Eighth Circuit concluded that the pipe's manufacturer was not liable for a failure to warn regarding dangers associated with the pipe, as the hazards were well known throughout the industry, and both the supervisor and his employer were aware of them. (*Id*. at pp. 687-688.)

Finally, some courts have concluded that a sophisticated intermediary's knowledge (or potential knowledge) of an item's hazards is properly imputed to its employees or servants. In *Akin v. Ashland Chemical* (10th Cir. 1998) 156 F.3d 1030, 1037 (*Akin*), workers at a United States Air Force base asserted claims against a manufacturer of chemical products, alleging that they suffered injuries while using the products to clean jet engine parts. After determining that the Air Force was a "'knowledgeable purchaser'" regarding the chemicals' hazards, the 10th Circuit held the manufacturer had no duty to warn the plaintiffs because they were "deemed to possess the necessary level of sophistication." (*Id*. at p. 1037; see also *Davis v. Avondale Industries,* Inc. (5th Cir. 1992) 975 F.2d 169, 173 [concluding that under Louisiana law, manufacturer has no duty to warn employees of sophisticated purchaser].)

23

*Johnson* does not directly resolve this division of opinion, as the case involved no "sophisticated user intermediary," and as noted in *Stewart*, the Supreme Court did not expressly authorize the imputation of an intermediary's sophistication to the ultimate user (*Stewart*, *supra*, 190 Cal.App.4th at pp. 28-30). Furthermore, an examination of *Johnson* establishes that the court recognized the issue now before us, but did not decide it.

The discussion in *Johnson* manifests the Supreme Court's awareness of the issue. The court referred to several out-of-state cases, including *Akin* and *Strong*, as well as a treatise stating that the defense "usually" precludes liability to a sophisticated purchaser and its employees. (*Johnson*, *supra*, 43 Cal.4th at pp. 65-66.) The court also noted that California law limits the duty to warn users in a situation not involving an employment relationship, remarking that manufacturers of prescription drugs need not warn patients of dangers "'readily known and apparent'" to their physicians. (*Id*. at p. 67, quoting *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362 (*Plenger*).) Furthermore, the court discussed two cases applying California law in which the sophisticated use defense had been extended to employees, namely, *Fierro v. International Harvester Co.* (1982) 127 Cal.App.3d 862 (*Fierro*) and *In re Related Asbestos Cases* (N.D. Cal. 1982) 543 F.Supp. 1142, 1152 (*Asbestos Cases*).

In discussing *Fierro* and *Asbestos Cases*, however, the Supreme Court signaled its intention not to decide the issue before us. In *Fierro*, a manufacturer sold a skeletal truck consisting of an engine, cab, and chassis to a packing company, which modified the truck by adding a refrigerator powered by the truck's battery. (*Fierro*, *supra*, 127 Cal.App.3d at p. 865.) Five years later, an employee of the packing company died when the truck caught fire during an accident. (*Ibid*.) After the employee's survivors asserted claims against the

24

manufacturer for negligence and strict liability, a jury returned verdicts in favor of the manufacturer. (*Ibid*.) On appeal, the plaintiffs contended that the jury should have been instructed that the manufacturer had a duty to warn that attaching the refrigerator to the truck's battery could create a fire hazard. (*Ibid*.) The appellate court concluded that the plaintiffs had forfeited that contention by failing to raise it adequately at trial. (*Id*. at p. 867.) Nonetheless, the court stated that under the circumstances, the manufacturer had no duty to warn because "[a] sophisticated organization like [the packing company] does not have to be told that gasoline is volatile and that sparks from an electrical connection or friction can cause ignition." (*Id.* at p. 866.) In *Johnson, supra*, 43 Cal.4th at page 68, our Supreme Court observed only that the appellate court had impliedly adopted the sophisticated user defense, without discussing the propriety of the defense as applied.

In *Asbestos Cases*, shipyard workers employed by the Navy initiated an action against suppliers of asbestos-laden products, alleging that exposure to the products caused their injuries. (*Asbestos Cases, supra,* 543 F.Supp. at p. 1150.) In permitting the defendants to assert a sophisticated user defense based on the Navy's superior knowledge of the dangers of asbestos, the federal court predicted that our Supreme Court would recognize such a defense, with the qualification that plaintiffs would be authorized to rebut it "by demonstrating that the defendants might have foreseen the Navy's alleged negligence." (*Johnson*, *supra*, 43 Cal.4th at p. 69.)

In *Johnson*, the Supreme Court addressed the qualification proposed in *Asbesto Cases*, stating: "The federal court's prediction that this court would adopt the sophisticated user defense on the condition that a plaintiff could negate it by showing that the sophisticated user's misuse of the product was foreseeable is not

at issue here, and we do not address it at this time." (*Johnson*, *supra*, 43 Cal.4th at p. 69, fn. 5.) The Supreme Court thus declined to decide whether a plaintiff's employment or servant relationship with a sophisticated intermediary user necessarily shields defendants from liability.

We therefore turn to that issue. In our view, to the extent *Johnson* provides guidance on the issue, it impliedly repudiates JCI's contention. As noted above (see pt. B.1., *ante*), the Supreme Court concluded that "under the sophisticated user defense, the inquiry focuses on whether *the plaintiff* knew, or should have known, of the particular risk of harm from the product giving rise to the injury." (*Johnson,supra*, 43 Cal.4th at p. 71, italics added.) Thus, in actions by employees or servants, the critical issue concerns their knowledge (or potential knowledge), rather than an intermediary's sophistication.

This conclusion flows directly from section 388 itself. Under section 388, a supplier of a dangerous item to users "directly or through a third person" is subject to liability for a failure to warn, when the supplier "has no reason to believe that those for whose use the [item] is supplied will realize its dangerous condition." Accordingly, to avoid liability, there must be some basis for the supplier to believe that the ultimate user knows, or should know, of the item's hazards. In view of this requirement, the intermediary's sophistication is not, as matter of law, sufficient to avert liability; there must be a sufficient reason for believing that the intermediary's sophistication is likely to operate to protect the user, or that the user is likely to discover the hazards in some other manner. The fact that the user is an employee or servant of the sophisticated intermediary cannot plausibly be regarded as a sufficient reason, as a matter of law, to infer that the latter will protect the former. We therefore reject JCI's contention that an intermediary's

26

sophistication invariably shields suppliers from liability to the intermediary's employees or servants.**7**

Under the authority discussed above, suppliers may provide the additional required showing in many ways, which we do not attempt to enumerate in a definitive manner. In lieu of showing that warnings were issued to the intermediary (§ 388, com. k., pp. 306-307), a supplier may offer evidence that it reasonably believed that the intermediary would warn the users (*In re Brooklyn*

---

**7**    CJAC  proposes that we apply section 2 of the Restatement Third of Torts: Products Liability, rather than section 388. However, as the latter section has been adopted as law in California (*Johnson, supra*, 43 Cal.4th at p. 71), we decline to do so. Nonetheless, section 2 of the Restatement Third of Torts: Products Liability would not dictate a contrary result were we to consider it. Comment i to section 2 states: "There is no general rule as to whether one supplying a product for the use of others through an intermediary has a duty to warn the ultimate product user directly . . . . The standard is one of reasonableness in the circumstances. Among the factors to be considered are the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user. Thus, when the purchaser of machinery is the owner of a workplace who provides the machinery to employees for their use, and *there is reason to doubt that the employer will pass warnings on to employees*, the seller *is required to reach the employees directly* with necessary instructions and warnings if doing so is reasonably feasible." (Rest. 3d Torts, Products Liability, § 2, com. i., p. 30, italics added.)

Pointing to *Persons*, *supra*, 217 Cal.App.3d 168, CJAC also contends that JCI's proposed instructions were legally correct, arguing that *Persons* approved the application of the theory found in the instructions in "a similar context." We disagree. In *Persons,* the appellate court held that when a manufacturer supplies goods to an intermediary, the manufacturer is not required to accompany the goods with warnings if those warnings would be ineffective with respect to the ultimate user. (*Persons*, *supra*, 217 Cal.App.3d at pp. 177-178.) The situation before us is materially different, as no evidence was presented that warnings on JCI's products would have been ineffective with respect to users such as William Pfeifer.

*Navy Yard Asbestos Litigation*, *supra*, 971 F.2d at p. 836); that the employees or servants knew or should have known of the dangers, in view of their experience or training (*Strong*, *supra*, 667 F.2d at p. 683); or that the specific dangers were so "readily known and apparent" to the intermediary that it would be expected to protect its employees or servants (see *Plenger*, *supra*, 11 Cal.App.4th at p. 362; *Fierro*, *supra*, 127 Cal.App.3d at p. 866.)

The trial court thus properly declined to give JCI's proposed instructions, as they erroneously stated that employees of a sophisticated user are, by virtue of their employment, deemed to be sophisticated users. Furthermore, there was insufficient evidence to support any legally correct version of the sophisticated user defense. The evidence at trial established only (1) that by the 1960's, medical researchers agreed that asbestos caused cancer; (2) that JCI issued no warnings regarding its products while William Pfeifer served in the Navy from 1963 to 1971; (3) that Pfeifer had no training or knowledge regarding the dangers of asbestos, (4) that the Navy had a medical staff with access to research on asbestos; (5) that studies of Navy workers in the 1940's, 1960's, and 1970's disclosed some hazards from asbestos dust, and (6) that in the early 1970's, the Navy began an asbestos abatement program aimed at containing dust from asbestos insulation.

Notably absent is any evidence that JCI had reason to believe the Navy would issue warnings to Pfeifer regarding JCI's products while he served in the Navy, or that it was then "readily known and apparent" to the Navy that the amounts of dust released from JCI's products were hazardous (*Plenger*, *supra*, 11 Cal.App.4th at p. 362). During Pfeifer's period of service, the Navy studies appear to have classified JCI's gaskets and packing as "nondusty." Although the evidence at trial may have shown that the Navy, as a "sophisticated user intermediary," was negligent regarding JCI's products, the evidence supported no

28

reasonable inference by JCI that the Navy would warn or otherwise protect Pfeifer from the dangers of JCI's products. Accordingly, JCI had "no reason" to believe that Pfeifer would "realize [their] dangerous condition." (Rest.2d Torts, § 388(b).) In sum, the trial court properly declined to give JCI's proposed instructions and did not err in directing a verdict on its "sophisticated user" defense.[8]

### C. *Punitive Damages*

JCI challenges the award of punitive damages on several grounds, contending that there was insufficient evidence regarding JCI's egregious conduct and ability to pay, that the evidence concerning JCI's financial condition was improperly admitted, and that the award was excessive. As explained below, we reject the contentions.

---

[8] JCI contends in its reply brief that its failure to provide warnings was not the "proximate cause" of Pfeifer's harm, arguing that the risks associated with its products were known to the Navy, and that there was no evidence that warnings to the Navy would have affected its conduct. However, JCI requested no "proximate cause" instruction reflecting this theory, and it does not argue on appeal that the trial court was required to instruct the jury in accordance with the theory. Furthermore, in *Stewart*, the appellate court concluded that *Johnson* does not support such an instruction. (See *Stewart*, *supra*, 190 Cal.App.4th at pp. 28-30.) We agree with *Stewart* on this matter.

We also observe that JCI's contention is not directed at the instructions JCI actually requested, and does not purport to show the legal correctness of those instructions. The theory of proximate causation underlying the contention has no direct bearing on whether employees of a sophisticated user are themselves sophisticated users as a matter of law, as asserted in JCI's requested instructions.

29

### 1. *Malice, Fraud, or Oppression*

We begin with JCI's challenge to the jury's finding that JCI acted with malice, fraud, or oppression.

#### a. *Governing Principles*

Generally, punitive damages may be awarded only when the trier of fact finds, by clear and convincing evidence, that the defendant acted with malice, fraud, or oppression. (Civ. Code, § 3294, subd. (a).) As nonintentional torts support punitive damages when the defendant's conduct "involves conscious disregard of the rights or safety of others," our focus is on malice and oppression. (See *Gawara v. United States Brass Corp.* (1998) 63 Cal.App.4th 1341, 1361.) As defined in the punitive damages statute, "[m]alice" encompasses "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights and safety of others," and "[o]ppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subds. (c)(1), (c)(2).) The term "'despicable,'" though not defined in the statute, is applicable to "circumstances that are 'base,' 'vile,' or 'contemptible.'" (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725, quoting 4 Oxford English Dict. (2d ed. 1989) p. 529.)

Under the statute, "malice does not require actual intent to harm. [Citation.] Conscious disregard for the safety of another may be sufficient where the defendant is aware of the probable dangerous consequences of his or her conduct and he or she willfully fails to avoid such consequences. [Citation.] Malice may be proved either expressly through direct evidence or by implication through

indirect evidence from which the jury draws inferences. [Citation.]" (*Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1228.)

In addressing JCI's challenge, we "inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence . . . .' [Citation]." (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891.) Under that standard, we review the evidence in the light most favorable to the Pfeifers, give them the benefit of every reasonable inference, and resolve all conflicts in their favor, with due attention to the heightened standard of proof. (*Ibid*.)

b. *Analysis*

We find guidance regarding JCI's contention from *Stewart*, *supra*, 190 Cal.App.4th 23. There, the evidence established that the defendant, a supplier of raw asbestos, was aware of the dangers of asbestos as early as 1964. (*Id*. at pp. 34-35.) The defendant warned its workers, but decided to minimize its disclosure of information regarding the dangers of its type of asbestos to customers and workers who used products containing it. (*Ibid*.) In affirming the jury's finding of malice, fraud, or oppression, the court concluded that the evidence showed that the defendant "did not share its knowledge of the dangers of asbestos with its customers or with individuals who would, predictably, be exposed to dust from its products, and that it instead sought to downplay the risk." (*Id*. at p. 34.)

The evidence below presented a similar situation. To begin, the evidence showed that during the 1970's, JCI knew that asbestos dust was hazardous, and it took action to protect its own employees from the hazards. George Springs, JCI's representative, testified that in 1970, JCI learned that handling raw asbestos was hazardous to certain workers. In 1972, OSHA promulgated regulations requiring

31

manufacturers of asbestos-based products to monitor the concentrations of asbestos fibers in the air in their factories. In compliance with the regulations, JCI began monitoring the air in its factories for asbestos particles, and used engineering controls to suppress dust levels. Later, in 1981, pursuant to the regulations, JCI prepared a safety data sheet for the 2150 gaskets warning its employees that exposure to asbestos caused asbestosis and cancer.

The evidence also supports the inference that JCI knew that its products were likely to pose a danger to users, whom it did not warn. Under the OSHA regulations, manufacturers were required to place warning labels on their products unless the asbestos fibers had been modified "by a bonding agent . . . so that during any reasonably foreseeable use, . . . no airborne concentrations of asbestos fibers in excess of [specified] exposure limits [would] be released." According to Springs, JCI knew that users replaced gaskets using methods that created asbestos dust or fragmented old gaskets, yet it never tested its products to determine whether those methods generated concentrations of asbestos fibers exceeding the regulatory limits. Millette, the Pfeifers's environmental scientist, testified that the bonding agents in JCI's products did not fully encapsulate the asbestos fibers; in addition, he stated that certain operations that Pfeifer performed on the products released concentrations of asbestos fibers "many thousands" greater than ordinary background levels.

We conclude that the evidence was sufficient to show malice, that is, despicable conduct coupled with a conscious disregard for the safety of others. In view of JCI's compliance with the OSHA regulations regarding its own workplace, JCI fully understood that asbestos dust endangered workers, but it did not issue warnings to customers until 1983, notwithstanding its awareness that they used the products in ways that generated considerable asbestos dust. Indeed,

although JCI informed its employees that the asbestos used in making 2150 gaskets caused cancer, JCI provided that information to customers only when they asked for the 2150 safety data sheet. The evidence thus established that JCI carried on despicable conduct with an awareness of the "probable dangerous consequences," and "willfully fail[ed] to avoid those consequences." (*Angie M. v. Superior Court, supra,* 37 Cal.App.4th at p. 1228.)

JCI maintains that there is insufficient evidence of malice or oppression, pointing to evidence supporting the inference that JCI sold its products with the good faith belief that they were safe. JCI argues that it reasonably believed that the bonding agents in the products fully encapsulated the asbestos fibers; that its manufacturing experience and the then-effective OSHA regulations supported its belief that the products were safe; that no specific study showed that the products were unsafe; and that its failure to test the products was consistent with industry-wide practices.

In so arguing, however, JCI "misapprehends our role as an appellate court. Review for substantial evidence is not trial de novo. [Citation.]" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 866.) When there is substantial evidence to support the jury's actual conclusion, "it is of no consequence that the [jury] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870 874, italics omitted.)

The jury rejected the inferences that JCI proposes on appeal, and the trial evidence supports its decision to do so. Generally, the existence of governmental safety regulations does not bar an award of punitive damages for egregious misconduct that they are ineffective in preventing. (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 810.) Nor does evidence suggesting that a

33

manufacturers' failure to warn may have been consistent with industry practices necessarily preclude an award of punitive damages. (See *id*. at pp. 804, 807-815.)

Here, the OSHA regulations effectively obliged JCI to determine whether its products were exempt from the OSHA warning requirement, as the requirement applied to any product during the "reasonably foreseeable use" of which "airborne concentrations of asbestos fibers in excess of [specified] exposure limits [would] be released." JCI knew that its customers used the products in ways capable of generating dangerous levels of asbestos dust, yet it neither attempted to determine such levels nor issued warnings. According to Springs, JCI knew that users like Pfeifer replaced gaskets using power wire brushes and compressed air, which generated asbestos dust and caused the old gaskets to disintegrate. Moreover, the evidence showed that JCI could have assessed those levels, as Springs testified that in the 1970's, JCI monitored the concentration of asbestos particles in the air of its factories and used engineering controls to suppress dust levels, in order to comply with the OSHA regulations.[9] In view of the testimony from Dr. Brodkin, the Pfeifers' expert on asbestos-related diseases, there was ample evidence that during the 1970's, it was widely accepted that asbestos dust was carcinogenic. The 1972 OSHA regulations, which were admitted into evidence, stated: "No one has disputed that exposure to asbestos of high enough intensity and long enough duration is causally related to asbestosis and cancers."[10] The evidence was thus

---

[9] In addition, Millette testified that since the 1940's, technology has been available to manufacturers to determine the level of particles in air.

[10] In admitting the OSHA regulations over JCI's hearsay objection, the trial court stated that the OSHA regulations were admitted not to establish "the truth of the matter," but to show what OSHA had promulgated in 1972. The jury could thus properly consider the OSHA regulations in determining JCI's state of mind, as Springs stated that JCI attempted to comply with them. As Witkin has

*(Fn. continued on next page.)*

34

sufficient to support the jury's conclusion that JCI did not market its products with a good faith belief in their safety.

JCI also contends that it cannot be subject to an award of punitive damages for providing gaskets and packing to the Navy pursuant to its specifications. We recognize that under the so-called "military contractor defense," a supplier of military goods may be exempt from liability arising from a failure to warn regarding the dangers of its products when military specifications preclude such warnings. (*Jackson v. Deft, Inc.* (1990) 223 Cal.App.3d 1305, 1311-1319.) However, JCI does not argue -- and the evidence does not support -- that the Navy's specifications precluded warnings regarding the dangers of asbestos. Moreover, as discussed above, the evidence supporting the award primarily concerns JCI's conduct after Pfeifer left the Navy, and there is no evidence that the products he used as a civilian boiler technician were subject to specifications that barred such warnings. (See *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 550-556 (*Bullock*) [affirming punitive damages awarded based on defendant cigarette manufacturer's misconduct during limited portion of plaintiff's entire period of cigarette use].) We therefore reject JCI's contention. In sum, there was sufficient evidence to support the jury's finding of malice, fraud or oppression.

---

explained, "[O]ut-of-court statements not offered to prove the truth of the matter stated are not regarded as hearsay." (1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 5, pp. 683-684.) Such statements may be admitted to show the state of mind of the declarant and the person who heard or received the statement. (*Id*. at §§ 36, 40, pp. 718-719, 722-723.)

## 2. *JCI's Financial Condition*

JCI challenges the Pfeifers' showing regarding its financial condition. Generally, "an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109 (*Adams*).) JCI argues (1) that the trial court erred in ordering JCI to produce evidence of its financial condition, and (2) that the Pfeifers' showing was inadequate to support the award of punitive damages.

### a. *Underlying Proceedings*

Prior to trial, the Pfeifers served requests on JCI under Code of Civil Procedure section 1987 to produce evidence at trial regarding its financial condition. The requests sought testimony from Springs and certain specified documents. JCI objected to the requests on the ground that they did not comply with subdivision (c) of Civil Code section 3295, which governs pretrial discovery regarding a defendant's financial condition.

After the jury returned its special verdicts in the first phase of trial, the Pfeifers asked the trial court to order JCI to produce the requested evidence, for purposes of the second phase. Relying on *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597 (*Mike Davidov Co.*), they argued that under subdivision (c) of Civil Code section 3295, a court may direct a defendant to produce evidence of its financial condition after a jury has found that it is subject to an award of punitive damages, even when the plaintiff made no pretrial efforts to obtain the evidence. Over JCI's objections, the court ordered it to produce Springs as a witness and two documents regarding JCI's financial condition, namely, a balance sheet and an income statement, both dated July 31, 2010.

JCI produced the financial documents, but not Springs. Regarding Springs's failure to appear, JCI's counsel informed the trial court simply that "Mr. Springs is not here." Jay Stuemke, the Pfeifers' counsel, argued that JCI's refusal to provide a witness frustrated his presentation of the financial documents to the jury, as they assigned $244 million to a undefined category described only as an "asbestos litigation set aside." In response, JCI's counsel agreed to stipulate that the funds be characterized to the jury as "set aside to pay for asbestos . . . litigation," including "defense costs" and "asbestos liabilities." JCI's counsel further objected to the admission of the documents themselves, but said that the information within them could be provided to the jury in a "demonstrative" manner. Following a discussion, the parties agreed that Stuemke would present information from the documents to the jury using a demonstrative board.

Before Stuemke's presentation to the jury, JCI's counsel voiced a concern that the "set aside" for asbestos litigation should not be described as a "cash provision." According to counsel, the "set aside" was properly regarded as "a reserve against assets." In response to the trial court's inquiries, JCI's counsel explained that his concern focused on the use of the word "cash." The court directed Stuemke to refer to the "set aside" as "funds" or "money."

Stuemke then spoke to the jury, stating: "I'm going to write down numbers on this board for the year 2009 in this column and the year 2010 in this column. [JCI's] assets in 2009, $336,870,000. [For] 2010, $403,089,000 in assets. Cash on hand in 2009, $90,882,000. Cash on hand in 2010, 15,895,000. . . . Liabilities [for] 2009, $485,000,000. Liabilities [for] 2010, $528,613,000[.] Leaving their net worth for 2009 at negative $148,130,000, and for 2010, negative $125,524,000 . . . ."

Stuemke further stated: "Included in these liabilities is money that [JCI} has set aside for asbestos litigation like this, money they've set aside to pay lawyers and to pay verdicts and judgments. The money set aside in 2009, $246, 236,000. [For] 2010, money set aside for asbestos, $244,278,000 . . . . So if you subtract from their liabilities the money they've set aside for asbestos in 2009, their net worth is a positive $98,106,000. And for 2010, positive $118,754,000."

JCI's counsel raised no objection to this presentation, and no other evidence was submitted to the jury during the second phase of trial. During closing arguments, Stuemke argued that JCI's "nerve endings" for feeling pain were in its bank account, where it had "set aside money to pay asbestos claims." JCI's counsel objected to this remark, contending that it suggested that the money set aside for asbestos litigation was in a bank account. The trial court sustained the objection and admonished the jury to disregard Stuemke's reference to money in an account, stating, "There's no evidence [of] that." Following Stuemke's rebuttal argument, which made no mention of cash or a bank account, the trial court repeated the admonishment.

b. *Order to Produce Witness and Documents*

JCI contends the trial court erred in ordering it to produce evidence under subdivision (c) of Civil Code section 3295 (subdivision (c)). That provision states in pertinent part: "No pretrial discovery by the plaintiff shall be permitted with respect to [evidence of the defendant's financial condition] unless the court enters an order permitting such discovery pursuant to this subdivision. . . . Upon motion by the plaintiff supported by appropriate affidavits and after a hearing, if the court deems a hearing to be necessary, the court may at any time enter an order permitting the discovery otherwise prohibited by this subdivision if the court

38

finds, on the basis of the supporting and opposing affidavits presented, that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294." JCI maintains the trial court erred in ordering the production of evidence, arguing that the Pfeifers did not comply with the motion procedure specified in subdivision (c).

We find dispositive guidance on JCI's contention from *Mike Davidov Co.* There, the plaintiff conducted no discovery regarding the defendant's financial condition prior to the bench trial on the plaintiff's claims. (*Mike Davidov Co., supra,* 78 Cal.App.4th at pp. 602-603.) After the court found that the defendant had engaged in fraud and awarded compensatory damages, it asked whether the plaintiff had any evidence of the defendant's financial condition, for purposes of an award of punitive damages. (*Id*. at p. 603.) The plaintiff acknowledged that he had no such evidence, and requested a hearing and an opportunity to conduct discovery into the defendant's financial condition. (*Ibid*.) When the court ordered a hearing and directed the defendant to produce his financial records, the defendant raised only a single objection, namely, that the plaintiff had neither sought pretrial discovery into the records nor subpoenaed them for trial. (*Ibid*.) Later, the defendant failed to produce his records at the hearing, and the court issued an award of punitive damages to the plaintiff. (*Id*. at p. 604.)

On appeal, the defendant challenged the award of punitive damages on several grounds, including (1) that the plaintiff had presented no evidence of financial worth, and (2) that the plaintiff had not complied with the pretrial discovery procedure specified in subdivision (c) of Civil Code section 3295. (*Mike Davidov Co*., *supra*, 78 Cal.App.4th at pp. 607-610.) After concluding that the defendant had forfeited contention (1), the appellate court rejected contention (2). (*Id*. at p. 609.) The court stated: "[S]ubdivision (c)[] allows the trial court,

39

'*at any time*,' to enter an order permitting the discovery of a defendant's

. . . financial condition, if the plaintiff has established that there is a substantial

probability that he or she can prevail on a claim upon which an award of punitive

damages can be based. While it is true that subdivision (c) states that such an

order may be made '[u]pon motion by the plaintiff supported by appropriate

affidavits and after a hearing,' that subdivision clearly presupposes that such

motion procedure is required *where the plaintiff has not actually prevailed on his

or her claim at trial.* However, once there has been a determination of liability by

the trier of fact based on an actual weighing of the credibility of witnesses, this

kind of affidavit-and-hearing procedure is patently superfluous. So long as the

trial court allows the defendant sufficient time, following a determination of

liability, to collect his or her financial records for presentation on the issue of the

amount of such damages to be awarded, there is nothing prejudicial or unfair about

using such a process to try the issue of the amount of punitive damages. If

anything, this method serves the purpose behind [Civil Code] section 3295, to wit,

to protect against premature disclosure of the defendant's financial condition.

[Citation.]" (*Ibid*.)

We conclude that JCI was properly ordered to produce evidence of its

financial condition, even though the Pfeifers did not comply with the motion

procedure specified in subdivision (c). As noted in *Mike Davidov Co*., that

procedure was rendered superfluous by the jury's finding regarding JCI's malice,

oppression, or fraud.

JCI urges us to depart from *Mike Davidov Co*., arguing that its discussion of

subdivision (c) is merely incorrectly reasoned dicta. We disagree. To begin, the

discussion constitutes a holding, as it addressed a nonforfeited contention.

Moreover, we find it persuasive. Generally, in interpreting a statute, courts seek

40

the legislative intent underlying the statute, looking first to the ordinary meaning of its language. (*Dyna-Med, Inc. v. Fair Employment & Housing Com*. (1987) 43 Cal.3d 1379, 1387.) Furthermore, "the statute must be given a fair, reasonable and common sense interpretation[,] and one that is practical rather than technical and that leads to a wise policy rather than to mischief or an absurdity." (*People v. Hinojosa* (1980) 103 Cal.App.3d 57, 64.)

It is well established that Civil Code section 3295 "was enacted . . . to protect against the premature disclosure of a defendant's financial condition when punitive damages are sought." (*Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 777.) As noted in *Mike Davidov Co*., the language of subdivision (c) manifests a legislative intent to authorize a discovery order "at any time." (*Mike Davidov Co., supra,* 78 Cal.App.4th at p. 609.) Furthermore, in view of the first sentence of subdivision (c), it is clear that the Legislature's intent was to permit pretrial discovery through the motion procedure. However, requiring the motion procedure after the factfinder at trial has determined the defendant's liability for an award of punitive damages would create "an absurdity" (*People v. Hinojosa*, *supra*, 103 Cal.App.3d at p. 64). Generally, motions are confined to """"question[s] collateral to the main object of the action"""" (*Lewis v. Superior Court* (2008) 169 Cal.App.4th 70, 77, quoting *People v. Sparks* (1952) 112 Cal.App.2d 120, 121), whereas a trial constitutes the ultimate method of resolving the action (*Eagle Oil & Ref. Co. v. Prentice* (1942) 19 Cal.2d 553, 556). Accordingly, it makes little sense to compel the plaintiff to show a substantial probability of prevailing on the claim for punitive damages by means of a motion after that claim has been definitively determined at trial.

JCI's reliance on *Adams*, *supra*, 54 Cal.3d 105 and *Amoco Chemical Co. v. Certain Underwriters at Lloyd's of London* (1995) 34 Cal.App.4th 554 (*Amoco*

41

*Chemical Co.*) is misplaced. In *Adams*, our Supreme Court held that the plaintiff has the burden of proving the defendant's financial condition, for purposes of an award of punitive damages. (54 Cal.3d at pp. 119-123.) In so concluding, the court stated: "[U]nder . . . subdivision (c), the plaintiff is allowed, on a proper showing, to 'subpoena documents or witnesses to be available at the trial for the purpose of establishing the profits or financial condition' of the defendant. That plaintiff may also obtain pretrial discovery of that information. . . . We see no reason why it is even slightly unfair to require a plaintiff to use the procedures available." (*Id.* at p. 122.) However, the court did not mention the motion procedure or examine whether it applied to discovery after the trial on the defendant's liability for punitive damages. For this reason, *Adams* provides no guidance on the question before us. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524 & fn. 2 ("Language used in any opinion is . . . to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered."].)

The same is true of *Amoco Chemical Co*. There, the plaintiff initiated an action for breach of contract and bad faith against several insurers, seeking punitive damages. (*Amoco Chemical Co., supra,* 34 Cal.App.4th at pp. 555-556.) Throughout the litigation, the plaintiff never invoked subdivision (c) of Civil Code section 3295 to obtain discovery into the insurer's financial condition. (*Amoco Chemical Co., supra,* at p. 557, fn. 5.) Instead, prior to the trial, the plaintiff served requests on the insurers under Civil Procedure section 1987 to produce evidence at trial regarding their financial condition, but the insurers did not respond to the requests and declined to produce the evidence after the trial court ordered them to do so. (*Amoco Chemical Co., supra,* at p. 556.) As a result, the

court issued an award of sanctions against the insurers. (*Id*. at p. 558.) Later, following the trial, a jury awarded the plaintiff punitive damages. (*Ibid*.)

The appeal in *Amoco Chemical Co*. was limited to a single issue, namely, the propriety of the sanctions. (*Amoco Chemical Co., supra,* 34 Cal.App.4th at pp. 558-559.) After determining that the plaintiff had not complied with the procedural requirements of Code of Civil Procedure section 1987, the appellate court reversed the sanctions order. (*Amoco Chemical Co., supra,* at pp. 559-562.) The court's sole reference to subdivision (c) of Civil Code section 3295 occurred in the following remarks: "Despite the exhaustive pretrial discovery conducted in this case, [the plaintiff] elected to forego its pretrial right to inquire about [the insurers'] financial worth (Civ. Code, § 3295, subd. (c)) . . . . Whatever merit there might be to that approach in other cases, it was an unfortunate choice in this one." No holding in *Amoco Chemical Co*. bears remotely on the propriety of the court's order in this case. For the reasons discussed above, we conclude that the trial court properly applied subdivision (c).

### c. *The Pfeifers' Showing*

JCI maintains that the Pfeifers' showing was inadequate to establish its financial condition. We reject this contention.

Generally, evidence of the defendant's financial condition is required to establish the defendant's ability to pay an award of punitive damages. (*Adams*, *supra*, 54 Cal.3d at p. 108.) The function of this requirement is to ensure that the amount of punitive damages does not exceed the level necessary to properly punish and deter. (*Id*. at p. 112.) "The ultimately proper level of punitive damages is an amount not so low that the defendant can absorb it with little or no

discomfort [citation ], nor so high that it destroys, annihilates, or cripples the defendant. [Citations.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 621-622.)

Our Supreme Court has prescribed no rigid standard for measuring the ability to pay. (*Adams*, *supra*, 54 Cal.3d at p. 116, fn. 7.) Although net worth is the most common measure, its application is not mandatory, as net worth "is subject to easy manipulation." (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064-1065, fn. 3.) Nonetheless, "[i]n most cases, evidence of earnings or profit alone are not sufficient 'without examining the liabilities side of the balance sheet.' [Citations.] . . . Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income." (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680.)

Under these principles, a defendant may have the ability to pay the award of punitive damages, even though the defendant's net worth is negative. In *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 580, the evidence showed that the defendant's total revenues exceeded $250 million per year for three successive years, but that it suffered a net loss of $6.5 million in each of the years. In addition, the evidence established that the defendant had $19 million in a banking account and the ability to borrow $50 million. (*Id*. at p. 583.) The appellate court concluded that this evidence was sufficient to demonstrate the defendant's ability to pay a $300,000 award of punitive damages, pointing to its large yearly revenues and ability to borrow. (*Ibid*.)

Here, the Pfeifers' showing presented a similar set of circumstances regarding JCI's ability to pay. According to that showing, in 2009 and 2010, JCI had hundreds of millions of dollars of assets (including considerable sums of cash) and a net worth exceeding $98 million, disregarding the funds that JCI itself had

44

set aside for asbestos litigation. Moreover, the $14.5 million award of punitive damages constituted approximately 6 percent of the funds set aside for asbestos litigation costs and judgments in 2010. In view of JCI's large revenues and the funds set aside for absestos litigation, the award cannot be regarded as so high that it would destroy or cripple JCI.

JCI maintains that Stuemke exceeded the scope of the parties' stipulation, arguing that he improperly told the jury that JCI's net worth was positive if one removed the funds set aside for asbestos litigation from JCI's total liabilities. JCI failed to preserve this contention. Generally, an appellant forfeits the right to attack error by expressly or impliedly agreeing at trial to the procedure objected to on appeal. (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 166.) Before the trial court, JCI's counsel never objected to Stuemke's presentation on the ground raised on appeal; on the contrary, following the presentation, JCI's counsel stated, "That's fine, your honor." JCI's objections targeted only Stuemke's remarks during closing arguments suggesting that the funds set aside for asbestos litigation were held as cash in a bank account. As noted above (see pt. C.1., *ante*), the trial court sustained the objections and admonished the jury to disregard the remarks. There is no reason to believe the jury disregarded the court's instruction. JCI has thus failed to show error in Stuemke's presentation of the stipulated information to the jury.

JCI also contends the Pfeifers were obliged to present testimony from an accounting or financial expert to establish JCI's ability to pay. We disagree. Generally, after the party with the burden of proof on an issue "produces evidence of such weight that a determination in that party's favor would necessarily be required," the burden of producing evidence is transferred to the other party. (1 Witkin, Cal. Evidence (4th ed. 2000) Burden of Proof and Presumptions, § 4,

45

pp. 157-158, italics omitted.) Here, Stuemke identified JCI's total assets and total liabilities for 2009 and 2010, characterized the funds JCI had set aside for asbestos litigation as a liability, and described their function. In our view, this showing was sufficient to shift the burden of producing evidence regarding JCI's ability to pay to JCI. If JCI believed that additional evidence was needed to explain the "set aside" for asbestos litigation, it was free to call an expert. This JCI did not do. In sum, the Pfeifer's show was sufficient to show JCI's financial condition.

### 3. *Constitutional Limits on Punitive Damages*

JCI contends the award of punitive damages contravened applicable constitutional standards regarding such awards. As explained below, we disagree.

#### a. *Fair Notice Regarding Award of Damages*

JCI maintains that Civil Code section 3294, as applied in this case, was unconstitutionally vague, as it authorized an award of punitive damages without adequate notice to JCI. Under the due process requirements of the federal constitution, state statutes authorizing punitive damages must give tortfeasors fair notice of the damages that may be awarded for misconduct. (*Philip Morris U.S.A. v. Williams* (2007) 549 U.S. 346, 352; *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712 (*Roby*).) JCI contends the award of punitive damages is constitutionally infirm on the facts of this case, arguing that its conduct "was consistent with numerous objective indicators," including its manufacturing experience, the OSHA regulations, and the Navy's specifications for its products.

Generally, "'[a] challenge to the constitutional validity of a statute may be of two types: a facial challenge and an as-applied challenge. [Citation] 'A facial challenge to the constitutional validity of a statute or ordinance considers only the

text of the measure itself, not its application to the particular circumstances of an individual.' . . . In contrast, an as-applied challenge seeks 'relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied.' [Citation.]" (*San Francisco Unified School Dist. v. City and County of San Francisco* (2012) 205 Cal.App.4th 1070, 1079, quoting *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).)

Here, JCI challenges Civil Code section 3294, as applied. We thus look to the facts of the case, and "consider whether in those particular circumstances the [statute's] application deprived [JCI] of a protected right." (*Tobe*, *supra*, 9 Cal.4 that p. 1084.) In examining JCI's contention, we defer to the jury's findings on historical facts that are supported by substantial evidence, and then independently review the constitutionality of the statute under those facts. (*People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1378.)

Under these standards of review, JCI's contention fails. As explained above (see pt. C.1.b., *ante*), there was sufficient evidence to support the jury's determination that JCI acted with malice, fraud or oppression, notwithstanding the evidence to which JCI directs our attention. Accordingly, Civil Code section 3294, as applied in this case, provided JCI with adequate notice of the award of punitive damages.

### b. *No Constitutionally Excessive Punishment*

JCI also contends that the amount of punitive damages was excessive under the applicable constitutional standards.

i. *Governing Principles*

Generally, the due process requirements of the federal constitution prohibit "'grossly excessive or arbitrary'" awards. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 (*Simon*), quoting *State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416-417 (*State Farm*).) Thus, courts must examine the amount of an award by reference to three constitutional "'guideposts,'" namely, "'(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'" (*Simon*, *supra*, 35 Cal.4th at p. 1172, quoting *State Farm, supra,* 538 U.S. at p. 418.) We review the award de novo in light of these factors. (*Simon*, *supra*, at p. 1172.) Nonetheless, we defer to the jury's findings of historical fact, which are reviewed for the existence of substantial evidence. (*Ibid*.)

ii. *Amount of Award*

JCI's maintains that its conduct was insufficiently reprehensible to support the $14.5 million punitive damages award.[11] In our view, this contention fails in

---

[11] Generally, in assessing the degree of reprehensibility of the defendant's conduct, courts must consider, whether "'[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.'" (*Roby*, *supra*, 47 Cal.4th at p. 713, quoting *State Farm*, *supra*, 538 U.S at p. 419.)

light of *Bankhead v. ArvinMeritor* (2012) 205 Cal.App.4th 68, 85 (*Bankhead*), and *Stewart*, *supra*, 190 Cal.App.4th 23, which involved facts resembling those presented here.

In *Bankhead*, a worker was employed for thirty years in automobile maintenance facilities, where he handled a manufacturer's brake systems that used asbestos linings. (*Bankhead, supra,* 205 Cal.App.4th at pp. 73-74.) Although the manufacturer knew of the dangers of asbestos and protected its own employees from asbestos dust, it sold its products for a lengthy period without warnings. (*Ibid*.) After the worker developed mesothelioma, he and his wife asserted claims for negligence, strict liability, and loss of consortium against the manufacturer and other suppliers of asbestos-laden products. (*Id*. at p. 74.) In affirming a $4.5 million punitive damages award, the appellate court held that the manufacturer's conduct displayed a "high degree of reprehensibility," which "continued over many years, and evinced an indifference to or reckless disregard of the health and safety of [the plaintiff] and those similarly situated." (*Id*. at pp. 85-86.)

Similarly, in *Stewart*, a worker and his wife asserted claims for negligence, strict liability, and loss of consortium against a supplier of raw asbestos and other defendants. (*Stewart, supra*, 190 Cal.App.4th at p. 25.) In affirming a $6 million award of punitive damages, the appellate court rejected the supplier's contention that its conduct "was at the low end of . . . reprehensibility," as the plaintiffs had shown that the supplier "profited from the sale of a dangerous substance, that it knew the dangers of its product, that it failed to warn consumers of those dangers, and [that the plaintiff] developed a fatal cancer as a result." (*Id*. at p. 38.)

Although the award here is larger than in *Bankhead* and *Stewart*, it is comparable in amount to awards against other defendants whose conduct in marketing dangerous products displayed a high degree of reprehensibility.

49

(*Bullock*, *supra*, 198 Cal.App.4th at pp. 556, 558-574 [affirming $13.8 million award against cigarette manufacturer]; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1690-1704 [modifying judgment against cigarette manufacturer to reduce $100 million punitive damages award to $50 million, and affirming judgment as modified]; *Romo v. Ford Motor Co.* (2003) 113 Cal.App.4th 738, 755-764, disapproved on another ground in *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1205 [affirming $23.7 million award against manufacturer of defective vehicle that caused death of plaintiffs' family members].)  We therefore conclude that JCI's conduct was sufficiently reprehensible to support the amount of the award.

### iii.  *Ratio of Punitive Damages to Compensatory Damages*

JCI maintains that the ratio of the punitive damages to the compensatory damages was impermissibly high.  We reject this contention.

Generally, California courts "have adopted a broad range of permissible ratios -- from as low as one to one to as high as 16 to 1 -- depending on the specific facts of each case."  (*Bankhead*, *supra*, 205 Cal.App.4th at p. 88.)  Relevant considerations include whether the compensatory award included "a punitive element" in the form of substantial emotional distress damages, and the reprehensibility of the defendant's conduct.  (*Id*. at pp. 88-90.)  In *Roby*, the defendant's misconduct manifested a low degree of reprehensibility and approximately two-thirds of the award of compensatory damages was for the plaintiff's distress (which included a physical component).  (*Roby, supra,* 47 Cal.4th at pp. 694-695, 718.)  Relying on *State Farm*, our Supreme Court held that a one-to-one ratio was the federal constitutional limit applicable in the case.  (*Id*. at p. 719.)  In contrast, in *Bullock*, the appellate court approved a punitive

50

damages award exemplifying a 16-to-1 ratio in a case involving extremely reprehensible conduct that resulted in the plaintiff's death, and an award of compensatory damages that included only a small amount for pain and suffering. (*Bullock, supra,* 198 Cal.App.4th at pp. 555, 563.)

Instructive here are *Bankhead* and *Stewart*. In *Bankhead*, the jury awarded the plaintiffs $1.47 million in economic damages, 2.5 million in noneconomic damages, and $4.5 million in punitive damages. (*Bankhead, supra*, 205 Cal.App.4th at pp. 74, 76.) Following an adjustment reflecting the jury's determinations of comparative fault, the defendant was determined to be liable for $1.845 million of the damages, comprising $1.47 million in economic damages and $375,000 in noneconomic damages. (*Id*. at pp. 74, 90.) The award of punitive damages ($6 million) was thus approximately 2.4 times greater than the award of compensatory damages ($1.845 million). (*Id*. at p. 90.) Noting that the defendant's conduct was highly reprehensible, the appellate court concluded that the ratio was "well within the range for comparable cases" and "not extraordinarily high," even though the jury's award of compensatory damages contained a punitive component. (*Ibid*.)

In *Stewart*, the jury awarded the plaintiffs $2.2 million in economic damages, $1 million in noneconomic damages, and $6 million in punitive damages. (*Stewart, supra*, 190 Cal.App.4th at p. 27.) Following adjustments for the defendant's share of comparative fault, the defendant was responsible for compensatory damages totaling $3.05 million, comprising $2.2 million in

51

economic damages and $850,000 in noneconomic damages.[12] (*Ibid*.) The appellate court approved the award of punitive damages, which represented a ratio of approximately two to one. (*Id*. at p. 38.) In so concluding the court rejected the defendant's contention that a one-to-one ratio was the federal constitutional maximum in the case, pointing to the defendant's reprehensible conduct. (*Ibid*.)

Here, JCI is liable for $6.23 million in compensatory damages, for purposes of determining the applicable ratio. This total comprises $2.69 million in economic damages (reflecting the post-trial adjustment for William Pfeifer's past medical expenses) and $3.54 million in noneconomic damages (reflecting an adjustment for JCI's share of comparative fault).[13] The award of punitive damages ($14.5 million) is therefore approximately 2.3 times the pertinent amount of compensatory damages ($6.23 million).[14] Although the jury's award of

---

[12] For the reasons explained below (see fn. 16, *post*), this total does not reflect the credits against the award of economic damages that the defendant received due to settlements by other defendants.

[13] The jury found that William Pfeifer had suffered $3,203,580.47 in economic damages, including $1,054,469.47 in past medical expenses; that the Pfeifers had suffered a total of $5,050,000 in noneconomic damages; and that JCI had a 70 percent share of comparative fault. Later, the trial court reduced the award to William Pfeifer for his past medical expenses to $545,703.29, making his total economic damages $2,694,814.29.

[14] JCI contends that the appropriate ratio is 4.31 to 1, which reflects a reduction in the amount of compensatory damages due to the credit that JCI received for the settlements by other defendants. However, in *Stewart*, the appellate court rejected the contention that the ratio is determined in light of that credit, stating: "We cannot see that the settlements reflect the fault of the other defendants, since settlement may be based on many factors, in addition to or even aside from fault. The settlements reduced the amounts [the defendant supplier] had to pay, but we cannot see that the fortuity of those settlements also governs the
*(Fn. continued on next page.)*

52

noneconomic damages was relatively larger than in *Bankhead* and *Stewart*, a one-to-one ratio is not the maximum allowable under the circumstances, in view of JCI's highly reprehensible conduct. (See *Stewart*, *supra*, 190 Cal.App.4th at p. 38.) As the overall ratio is comparable to those cases and within the range of permissible ratios, the award of punitive damages was not excessive in relation to the award of compensatory damages.

### iv. *Absence of Civil Penalties*

JCI contends the award of punitive damages was excessive, noting the absence of civil penalties related to asbestos-based products during William Pfeifer's naval and civil service. We disagree. Generally, civil penalties for acts comparable to the defendant's misconduct may demonstrate the existence of fair notice that wrongful conduct could entail punitive damages. (*Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1290.) However, as our Supreme Court has explained, the guidepost regarding civil penalties is of limited use in cases involving only common law tort duties. (*Simon*, *supra*, 35 Cal.4th at pp. 1183-1184.) Indeed, in *Bankhead*, which closely resembles the action before us, the appellate court determined that the civil penalty guidepost was "essentially irrelevant." (*Bankhead, supra,* 205 Cal.App.4th at p. 85, fn. 10.) We therefore conclude the absence of civil penalties does not establish that the award of punitive damages was excessive. In sum, the award did not contravene federal constitutional standards.

---

review of the punitive damages award." (*Stewart, supra,* 190 Cal.App.4th at p. 38.) In our view, this reasoning is correct.

D. *Expert Fees*

JCI challenges an award of $75,145.76 to the Pfeifers for expert fees under Code of Civil Procedure section 998. Regarding the award, subdivision (d) of Code of Civil Procedure section 998 provides: "If an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment or award in any action . . . , the court . . . , in its discretion, may require the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses . . . , in addition to plaintiff's costs." The Pfeifers maintain the fee award is beyond our review because JCI filed no notice of appeal regarding it. We conclude that we lack jurisdiction over JCI's contentions concerning the award.

The record discloses that on February 3, 2011, the trial court entered a judgment in favor of the Pfeifers awarding damages totaling $21,238,580.47. The judgment further provided that the Pfeifers were entitled to prejudgment interest "in the amount of $_____," and costs "in the amount of $_____." On March 7, 2011, JCI filed a motion to tax costs, which challenged the Pfeifers' request for the expert fees described above. On April 13, 2011, while that motion was pending, JCI filed its notice of appeal, which specified that the appeal was from the judgment, the denial of its motions for a new trial and for judgment notwithstanding the verdict, and "[t]hose pretrial, intermediate and post-trial rulings . . . involving the merits of the . . . action and/or which necessarily affected the . . . judgment . . . ." The notice contained no reference to the motion to tax costs. On April 25, 2011, in ruling on JCI's motion to tax costs, the trial court denied JCI's challenge to the pertinent component of the Pfeifer's request for expert fees.

The key issue before us is whether JCI was obliged to notice a separate appeal from the April 25, 2011 ruling. Generally, "'[i]f a judgment or order is

54

appealable, an aggrieved party must file a timely appeal or forever lose the opportunity to obtain appellate review.'  [Citations.]"  (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46, italics omitted, quoting Eisenberg, et al., Cal. Practice Guide:  Civil Appeals and Writs (Rutter Group 1989) [¶] 2.13, p. 2-5.).)  Furthermore, ""'[w]here several judgments and/or orders occurring close in time are separately appealable . . . , each appealable judgment and order must be expressly specified -- in either a single notice of appeal or multiple notices of appeal -- in order to be reviewable on appeal.""'" (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 239, quoting *DeZerega* v. *Meggs* (2000) 83 Cal.App.4th 28, 43.)  This requirement circumscribes our jurisdiction to review postjudgment orders  (*Colony Hill v. Ghamaty* (2006) 143 Cal.App.4th 1156, 1171).

A judgment is final and appealable if all that remains is a determination of costs and interest.  (*Amwest Surety Ins. Co. v. Patriot Homes, Inc.* (2005) 135 Cal.App.4th 82, 84 fn. 1.)  Thus "'[w]here the judgment is modified merely to add costs, attorney fees and interest, the original judgment is not substantially changed and the time to appeal it is therefore not affected.'  [Citations.]"  (*Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 222, quoting Eisenberg et al., Cal. Practice Guide:  Civil Writs and Appeals (The Rutter Group 2006) [¶] 3:56.3, p. 3-26.)  For this reason, when a party intends to challenge the judgment and a postjudgment order related to costs, the normal procedure is to file separate appeals from the judgment and the postjudgment order.  (*Torres v. City of San Diego*, *supra*, at p. 222.)  This is because the postjudgment order ordinary

constitutes a final order regarding a matter collateral to the judgment.[15]  (See *Robinson v. City of Yucaipa* (1994) 28 Cal.App.4th 1506, 1517-1518.)

The normal procedure is subject to a limited exception.  In *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 998 (*Grant*), the appellate court concluded that "when a judgment awards costs and fees to a prevailing party and provides for the later determination of the amounts, the notice of appeal subsumes any later order setting the amounts of the award." (*Ibid.*)  The court reasoned that when the judgment expressly provides for an award of costs or fees, the determination of the amount of the award is "not a collateral matter unrelated to the judgment's validity and finality," but "in essence defines the scope of the judgment itself."  (*Id*. at p. 997.)

In *Fish v. Guevara* (1993) 12 Cal.App.4th 142, 146-148 (*Fish*), the appellate court held that expert fee awards under Code of Civil Procedure section 998 fall outside the *Grant* exception.  There, the defendants prevailed in the action, and a judgment was entered in their favor, stating that they were entitled to "all costs, expenses, and disbursements allowed by law . . . ."  (*Fish, supra,* 12 Cal.App.4th at p. 144.)  After the plaintiffs filed a notice of appeal from the judgment, the trial court denied the plaintiffs' motion to tax costs, which challenged the defendants' request for an award of expert fees pursuant to Code of

---

[15]     As our Supreme Court has explained:  "When a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act, direct appeal may be taken. [Citations.]  This constitutes a necessary exception to the one final judgment rule.  Such a determination is substantially the same as a final judgment in an independent proceeding. [Citations.]"  (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368.)

Civil Procedure section 998. (*Fish, supra,* at p. 144.) The defendants noticed no appeal from the fee award. (*Ibid*.)

In concluding that the notice did not subsume the award of expert fees, the appellate court rejected the application of the *Grant* exception, stating: "*Grant* has no bearing on this case. The judgment in *Grant* awarded costs and attorney fees to the prevailing party as a matter of right. The subsequent order merely set the *amount* of those costs and fees. [Citation.] Since the prevailing party's right to costs and fees was determined by the judgment, the propriety of the award was not a collateral issue but was merely incidental to the judgment. [Citation.]" (*Fish, supra,* 12 Cal.App.4th at p. 147.) The court further explained: "An award of expert witness fees pursuant to [Code of Civil Procedure] section 998 is not incidental to the judgment but is instead a separately litigated issue. [Citation.] Prevailing parties do not recover their expert witness fees as a matter of right. When the opposing party has rejected a settlement offer and fails to obtain a more favorable judgment, the trial court may, in its discretion, make an award of expert witness fees. [Citation.] . . . Because expert witness fees are not incidental to the judgment, the propriety of a postjudgment award of expert witness fees cannot be reviewed on an appeal from the judgment." (*Id*. at p. 148.)

*Fish* is dispositive here. JCI's notice of appeal specified the judgment and other orders, but did not mention the pending motion to tax costs. Although the notice referred to orders "involving the merits of the . . . action and/or which necessarily affected the . . . judgment," the award of expert fees is not such a ruling. The notice of appeal thus did not subsume that award, notwithstanding the policy of construing notices of appeal liberally in favor of their sufficiency. (*Colony Hill v. Ghamaty*, *supra,* 143 Cal.App.4th at pp. 1171-1172.) Accordingly, the award is beyond the scope of our review.

JCI contends that *Fish* is wrongly decided.  We disagree.  Subdivision (b) of Code of Civil Procedure section 1032 provides that "[e]xcept as otherwise expressly provided by statute, a prevailing party is *entitled as a matter of right* to recover costs in any action or proceeding."  (Italics added.)  In contrast, Code of Civil Procedure section 998 "augments" the costs allowed under Code of Civil Procedure section 1032.  (Code Civ. Proc., § 998, subd. (a).)  Moreover, as noted above, subdivision (d) of Code of Civil Procedure section 998 consigns awards of expert fees exclusively to the trial court's discretion.  For this reason, such an award is collateral to the judgment.  In sum, JCI's appeal must be dismissed insofar as it challenges the award of expert fees.


## II

### The Pfeifers' Cross-Appeal

The Pfeifers challenge the trial court's determinations related to  JCI's credit based on the pre-verdict settlements by other defendants.  As explained below, we reject the Pfeifers' contentions, but conclude that the court's determination of the Pfeifers' net recovery of economic damages must be modified to correct an error that both sides acknowledge.


A. *Governing Principles*

The amount of compensatory damages for which JCI is responsible is subject to two distinct constraints.  Under Civil Code section 1431.2, JCI's liability for noneconomic damages is limited by its share of comparative fault. (*Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 1006 (*Jones*).)  That provision expressly encompasses damages for loss of consortium. (*Hackett v. John Crane, Inc.* (2002) 98 Cal.App.4th 1233, 1243-44 (*Hackett*); *Wilson v. John*

*Crane, Inc.* (2000) 81 Cal.App.4th 847, 863 (*Wilson*)). In contrast, JCI's liability for economic damages is not subject to an adjustment for its share of comparative fault. (*Hackett, supra,* 98 Cal.App.4th at p. 1239). However, under Code of Civil Procedure section 877, JCI was entitled to a credit against its liability for economic damages based on any portion of the pre-verdict settlements properly attributable to the claims for economic damages resolved at trial. (*Hackett*, *supra*, 98 Cal.App.4th at p. 1239.)

Our inquiry is focused on the determination of the credit when, as here, the pre-verdict settlements were never found to be in good faith. (See *Jones*, *supra*, 132 Cal.App.4th at pp. 1006-1007.) As explained in *Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 275-277 (*Espinoza*) and *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 839-841 (*Greathouse*), the credit's determination is straightforward when the settlements address only the claims resolved at trial and the settlement funds are "undifferentiated," that is, the settlements do not apportion the funds between the claims resolved at trial. In such cases, the credit may be calculated in the following manner. First, the trial court determines what the parties before us call the "*Greathouse* ratio," that is, the ratio of the economic damages to the total compensatory damages, as awarded at trial. (*Espinoza*, *supra*, 9 Cal.App.4th at pp. 275-277; *Greathouse*, *supra*, 35 Cal.App.4th at pp. 839-841.) Second, the credit is determined by multiplying the amount of the settlement funds by the *Greathouse* ratio. (*Espinoza*, *supra*, 9 Cal.App.4th at pp. 275-277; *Greathouse*, *supra*, 35 Cal.App.4th at pp. 839-841.) Thus, in the simplest cases, the credit "mirror[s] the factfinder's apportionment of damages." (*Hackett*, *supra*, 98 Cal.App.4th at p. 1233.)

Refinements in determining the credit are required, however, when the settlements purport to encompass claims not resolved at trial or specify an

59

allocation of the settlement funds. (*Jones*, *supra*, 132 Cal.App.4th at pp. 1006-1007.) We limit our discussion to the refinements applicable in personal injury actions involving married plaintiffs, one of whom is awarded only noneconomic damages for loss of consortium. In such cases, the court must assess the extent to which the settlements allocate funds to claims not resolved at trial. (*Hackett*, *supra*, 98 Cal.App.4th at pp. 1241-1242; *Wilson*, *supra*, 81 Cal.App.4th at pp. 860-863.) In addition, to the extent the settlements purport to allocate some portion of settlement funds among the claims resolved at trial, the court is obliged to decide whether the allocation should be used in calculating the credit. (*Jones*, *supra*, at pp. 1007-1011; *Wilson*, *supra*, at pp. 865-867.) These questions are consigned to the court's discretion. (*Jones*, *supra*, at pp. 1007-1011.)

If the court finds (1) that some portion of the settlement funds applies to claims not resolved at trial and (2) that the settlement does not govern the allocation of the remaining funds, the court must calculate the credit solely on the basis of the funds assignable to the claims resolved at trial. (*Hackett*, *supra*, 98 Cal.App.4th at p. 1244.) This calculation may be carried out by several mathematically equivalent methods. (*Ibid*., fn. 13; see *Jones*, *supra*, 132 Cal.App.4th at p. 1007, fn. 7.) These methods produce essentially the same result, except for slight differences caused by rounding. (*Hackett*, *supra*, at p. 1244., fn. 13; see *Jones*, *supra*, at p. 1007, fn. 7.)

The most straightforward method is to multiply the amount of the settlement funds assignable to the plaintiffs' claims by the ratio of the economic damages to the total compensatory damages (including the loss of consortium damages), as determined at trial. (*Hackett*, *supra*, 98 Cal.App.4th at p. 1244., fn. 13; see *Jones*, *supra*, 132 Cal.App.4th at p. 1007, fn. 7.) In effect, this method applies the *Greathouse* ratio. Thus, if the court has decided that *all* the settlement funds

concern the claims resolved at trial, the method reduces to the calculation described in *Espinoza* and *Greathouse*.

B. *Underlying Proceedings*

The jury found that William Pfeifer had suffered $3,203,580.47 in economic damages, including $1,054,469.47 in past medical expenses, and $4,000,000 in noneconomic damages; that Anne Pfeiffer had suffered $1,050,000 in noneconomic damages for loss of consortium; and that JCI had a 70 percent share of comparative fault. Later, JCI filed a motion to to reduce the award to William Pfeifer for his past medical expenses from $1,054,469.47 (the amount stipulated at trial) to $545,703.29.

On February 3, 2011, while JCI's motion was pending, the trial court conducted a hearing on the entry of a judgment and JCI's credit based on the pre-verdict settlements. On the same date, the court entered a judgment in favor of the Pfeifers awarding damages totaling $21,238,580.47, but deferred the determination of JCI's credit.[16]

On February 14, 2011, JCI filed a motion for a credit. In opposing the motion, the Pfeifers maintained that although the settlement funds totaled $3.82 million, only $1.91 million of the funds were assignable to their claims at trial, as the settlements expressly allocated one-half of the funds to those claims and one-half to wrongful death claims by William Pfeifer's heirs.

On March 9, 2011, after granting JCI's motion to reduce the award to William Pfeifer for his past medical expenses, the trial court issued its ruling

---

[16] The judgment appears to incorporate a reduction in the jury's awards of noneconomic damages to the Pfeifers, in accordance with the jury's allocation to JCI of a 70 percent share of the responsibility for the causation of the damages.

regarding the credit. In determining the credit, the court declined to adopt the allocation of funds stated in the settlements, and found that all the settlement funds were applicable to the claims resolved at trial. After noting that William Pfeifer's economic damages had been reduced to $2,694,814.29 through the adjustment to his past medical expenses, the court found that JCI was entitled to a credit of $1,320,192. In applying the credit, the court reduced the $2,694,814.29 award of economic damages by 70 percent (that is, JCI's percentage of comparative fault), and then applied the credit, resulting in a net recovery of $566,178 in economic damages.

### C. The Pfeifers' Contentions

The Pfeifers contend the trial court erred in setting aside the allocations stated in the settlements and in calculating the credit. They argue that only half the settlement funds -- that is, $1.91 million -- were properly assignable to their trial claims. They further argue that following the reduction of the medical expenses portion of the award of economic damages to William Pfeifer, the appropriate *Greathouse* ratio was 34.7 percent (the ratio of $2,694,814.29, the adjusted economic damages, to $7,744,814.29, the adjusted total compensatory damages). They maintain that the correct credit, calculated in light of their proposed *Greathouse* ratio, was $662,770, resulting in a net recovery of economic damages totaling $2,032,044.29 (that is, $2,694,814.29 minus $662,770).

#### 1. *Allocation in Settlements*

We begin with the Pfeifers' challenge to the trial court's ruling regarding the allocation in the settlements. Courts "have wide discretion in allocating prior settlement recoveries to claims not adjudicated at trial." (*Jones*, *supra*, 132

Cal.App.4th at p. 1008.) Under this standard, we examine the court's findings, whether express or implied, for the existence of substantial evidence. (*Roddis v. All-Coverage Ins. Exchange* (1967) 250 Cal.App.2d 304, 309; see *Wilson*, *supra*, 81 Cal.App.4th at pp. 866-867.)

Generally, an allocation in a settlement that has not been judicially approved does not bind the trial court. (*Jones*, *supra*, 132 Cal.App.4th at p. 1009.) Rather, the party seeking the benefit of the allocation has the burden of presenting evidence that the allocation in the settlement is reasonable. (*Ibid.*) Thus, the party must ordinarily show, by declarations or other evidence, that the allocation reflected a reasonable valuation of the pertinent claims, or that "the allocation was reached in a sufficiently adversarial manner" to ensure a reasonable valuation. (*Id.* at p. 1010, quoting *Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475, 1495-1496.) Absent such evidence, the court may properly reject the allocation in a settlement. (*Jones*, *supra*, at pp. 1010-1011.)

An instructive application of these principles is found in *Jones*. There, a Navy serviceman who was exposed to JCI's products developed mesothelioma following his naval career. (*Jones, supra,* 132 Cal.App.4 at pp. 996-997.) After he and his wife initiated an action against JCI for personal injury and loss of consortium, the jury awarded economic and noneconomic damages, including damages for the wife's loss of consortium claim. (*Ibid.*) In calculating JCI's credit for pre-verdict settlements, the trial court rejected the express allocation specified in the settlements for wrongful death claims. (*Id.* at p. 1008.) The appellate court affirmed the ruling, noting that the plaintiffs presented no evidence regarding the potential value of wrongful death claims by the ex-serviceman's heirs. (*Id*. at pp. 1008-1011.)

Here, the Pfeifers offered little or no evidence regarding the reasonableness of the allocation in the settlements other than the terms of the settlements themselves.[17]  In rejecting the allocation, the trial court found that the settlements, by themselves, did not constitute "persuasive evidence to assist the court."  The court further noted that there was no showing regarding William Pfeifer's relationships with his offspring, for purposes of determining the value of their claims.  In view of *Jones*, we find no abuse of discretion in the court's ruling.

*Hackett*, upon which the Pfeifers rely, is distinguishable.  As in *Jones*, *Hackett* involved an asbestos-related action for personal injury and loss of consortium against JCI by a former Navy serviceman and his wife.  (*Hackett, supra*, 98 Cal.App.4th at pp. 1236-1238.)  The pertinent settlements encompassed wrongful death claims not resolved at trial, but unlike those in *Jones*, allocated no specific portion of the settlement funds to them.  (*Id.* at pp. 1239-1242.)  After evidence was presented to the trial court that the ex-serviceman's heirs had a close relationship with him, the trial court found that 34 percent of the settlement funds were properly allocated to potential wrongful death claims.  (*Id.* at pp. 1241-1242.)  On appeal, JCI maintained only that the trial court had allocated an excessive amount of the settlement funds to those claims.  (*Id.* at p. 1241.)  The appellate court affirmed the ruling, concluding that there was ample evidence to support it.  (*Id.* at pp. 1241-1242.)

In contrast with *Hackett*, the Pfeifers maintain on appeal that the trial court was obliged to allocate one-half of the settlement funds to the wrongful death claims, as specified in the settlements.  To establish this contention, they must

---

[17]     The record reflects that the settlements were submitted to the trial court under seal.

identify evidence sufficient to require the trial court to accept that allocation. (See *Wilson*, *supra*, 81 Cal.App.4th at p. 866.) As explained above, the record discloses no such evidence. In sum, the trial court did not err in rejecting the allocation in the settlements.

### 2. *Calculation of Credit*

The Pfeifers contend the trial court calculated JCI's credit by means of an incorrect method. We disagree. In calculating the credit, the trial court applied a method approved in *Jones*.[18] (*Jones, supra,* 132 Cal.App.4th at p. 1007.) As explained there, the method is mathematically equivalent to "*Greathouse* ratio"-based method advocated by the Pfeifers. (*Id.* at p. 1007, fn. 7.) Indeed, multiplying the total amount of the settlement funds ($3.82 million) by the Pfeifers' proposed *Greathouse* ratio (34.7 percent) results in a credit essentially identical to the $1,320,192 credit determined by the trial court.[19]

---

[18]  The trial court calculated the credit in three steps. (See *Jones*, *supra*, 132 Cal.App.4th at p. 1007.) First, the court determined that the economic damages constituted 40 percent of William Pfeifer's total compensatory damages, and multiplied the amount of the settlement funds ($3.82 million) by that percentage, which yielded $1.528 million. This calculation had the effect of removing William Pfeifer's share of the noneconomic damages from the settlement proceeds. Second, the court determined that Ann Pfeifer's loss of consortium damages constituted 13.6 percent of the total compensatory damages awarded to the Pfeifers, and that the other damages constituted 86.4 percent of the total compensatory damages. Third, the court multiplied $1.528 million (the figure established in the first step) by 86.4 percent to exclude the portion of the settlement funds attributable to Ann Pfeifer's damages, resulting in a final credit of $1,320.192.

[19]  The "*Greathouse* ratio"-based calculation yields a credit of $1,325,540. The small difference between this sum and the trial court's credit is due to rounding. (See *Jones*, *supra,* 132 Cal.App.4th at p. 1007, fn. 7.)

### 3. *Comparative Fault*

The Pfeifers contend the trial court erred in adjusting their recovery of economic damages to reflect JCI's 70 percent share of comparative fault. JCI does not dispute that the Pfeifers' net economic damages should be calculated without reference to JCI's comparative fault, but asserts that the Pfeifers have forfeited their contention by failing to raise it expressly in their opening brief in the cross-appeal.[20]

We decline to find a forfeiture. Generally, the function of the forfeiture rule on appeal is to ensure that issues are adequately argued in the opening brief, for the benefit of the reviewing court and the respondent. (*Duncan v. Ramish* (1904) 142 Cal. 686, 698; see 9 Witkin, Cal. Procedure (5th ed. 2009) Appeal, §§ 701-702, pp. 769-772.) Here, the Pfeifers' opening brief in the cross-appeal asserts that with respect to the award of economic damages, the court "erroneously appl[ied] the jury's allocation of fault percentage, which is a factor only applied to the noneconomic damages portion of the verdict . . . ." It also proposes a calculation of the net recovery of economic damages that omits the improper application of JCI's share of comparative fault to the economic damages, and notes that before the trial court, JCI also suggested a calculation that omitted that application. Furthermore, although JCI asserts a forfeiture on appeal, it again

---

[20]     With respect to economic damages, codefendants are jointly and severally liable, but with respect to noneconomic damage, liability is several but not joint: "each defendant is liable for only that portion of the plaintiff's noneconomic damages which is commensurate with that defendant's degree of fault for the injury." (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1198.) Thus, any reduction in a damage award to reflect comparative fault is applied only to noneconomic damages.

66

proposes a determination of the Pfeifers' net economic damages that omits any reference to JCI's share of comparative fault.[21]

Because the error here is clear and not in dispute, we conclude that the Pfeifers' net recovery of economic damages should be determined without any adjustment for JCI's share of comparative fault. Accordingly, we will modify the net award of economic damages to $1,374,622.29 (that is, the $2,694,814.29 award of economic damages, as reduced with respect to William Pfeifer's past medical expenses, minus JCI's $1,320,192 credit).

---

[21] We also note that JCI's proposed value for the Pfeifers' net recovery of economic damages is identical to our value.

67

## DISPOSITION

JCI's appeal with respect to the award of expert fees is dismissed.  The judgment is modified to reflect that the Pfeifers' net recovery of economic damages is $1,374,622.29, and the judgment and related orders are affirmed in all other respects.  The Pfeifers are awarded their costs on appeal.

**CERTIFIED FOR PUBLICATION**

MANELLA, J.

We concur:

EPSTEIN, P. J.

SUZUKAWA, J.

68